**UNITED STATES of America,**
**Plaintiff,**

v.

**ALUMINUM COMPANY OF AMERICA**
**et al., Defendants.**

United States District Court
S. D. New York.
June 28, 1957.

Max Freeman, Atty., Dept. of Justice, Washington, D. C., for the United States.

Leon E. Hickman, Gen. Counsel, and William K. Unverzagt, Asst. Gen. Counsel, Aluminum Co. of America, William Watson Smith, Smith, Buchanan, Ingersoll, Rodewald & Eckert, Pittsburgh, Pa., L. Homer Surbeck, Hughes, Hubbard, Blair & Reed, New York City, for Aluminum Co. of America.

CASHIN, District Judge.

This is an application by the United States under Section X of the final judgment of July 6, 1950 for an order modifying Section VIII of that final judgment so as to extend the jurisdiction of this Court an additional five years within which period, if conditions so warrant, the United States may petition this Court for further remedial relief.

Section X of the final judgment of July 6, 1950 entered by Judge Knox of this Court, provides:

"Jurisdiction of this cause is retained for the purpose of enabling the plaintiff or Alcoa to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or complete execution of this judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of any violations thereof".

Section VIII of the final judgment of July 6, 1950 provides:

"The divestiture of plants and properties of Alcoa, for which the plaintiff has petitioned, is presently denied; however, jurisdiction of this cause is retained for five years from the date of adoption by the Court of a plan, pursuant to paragraph V of this judgment, for the disposal of stock interests, within which period, if conditions so warrant, plaintiff may petition this Court for further and more complete relief."

Brief History of Case

This anti-trust action has been actively litigated for over twenty years. Numerous ancillary proceedings have been held and determined. Fortunately, the purposes of this opinion will be served by a brief summary of the main course of events in its litigated history.

This case was commenced by the United States against the Aluminum Company of America (hereafter called "Alcoa") and numerous other defendants, on April 23, 1937. The United States charged Alcoa with numerous violations of Sections 1 and 2 of the Sherman Act, 15 U.S.CA. §§ 1, 2, and after twenty-six months of trial this Court, through Judge Caffey, dismissed the Government's case on July 23, 1942.

The Government appealed and, in the absence of a qualified quorum of the Supreme Court, the appeal by Special Act of Congress, 58 Stat. 272, Act June 9, 1944, 15 U.S.C.A. § 29, was heard and determined by the United States Circuit

Court of Appeals for the Second Circuit sitting as the court of final appellate jurisdiction. On November 12, 1945 the Circuit Court of Appeals, 148 F.2d 416, through Judge Learned Hand, affirmed in part and reversed in part the trial court's determination.

Insofar as is material here, the basis of the Circuit Court's reversal was that it found that Alcoa had unlawfully monopolized the aluminum ingot (primary aluminum) market in violation of Section 2 of the Sherman Act. The Circuit Court found that Alcoa's market control in aluminum ingots exceeded 90%. However, the Circuit Court directed that determination of what remedial relief was to be afforded the Government was to be held in abeyance pending the results and effects on competition of the Government's disposal of the huge aluminum manufacturing facilities constructed by it during World War II.

In 1947 Alcoa applied to this Court for a determination that it no longer had a monopoly and that competitive conditions had been restored in the aluminum industry. In 1948 the Government filed a petition for divestiture and other relief, contending that competitive conditions in the aluminum industry had not been established. Issue having been so joined Judge Knox of this Court, after extensive hearings and in an exhaustive and learned opinion granted the Government's application for relief—insofar as is material here—only to the extent of requiring that certain stockholders of Alcoa divest themselves of either their Alcoa stock or Aluminum Limited stock. The Government's application for divestiture was denied, as was Alcoa's petition for a determination that it no longer had a monopoly and that competitive conditions had been restored in the aluminum industry.

In denying the Government's application for divestiture Judge Knox stated (91 F.Supp. 333, 419):

"Nevertheless, the Government, for a period of five years, if conditions so warrant, may petition the Court for further and more complete relief".

No appeal was taken by either party from Judge Knox' decision. The Government on this application, made within the five-year period, seeks no further or more complete relief other than an extension of the five-year period to make such an application.

Judge Knox in his opinion made an exhaustive study and comprehensive analysis of the entire aluminum industry as it then existed. He correlated that analysis of the aluminum industry with a most learned exposition of the anti-trust law especially with respect to the function of a court in relief proceedings.

For the purposes of this motion the parties have stipulated and agreed to certain facts and tables substantially within the framework of those factors considered by Judge Knox and which for the most part merely bring up to date those factors considered in 1950. The Tables so stipulated to are included in the Appendix of this opinion. [153 F.Supp. 172] The facts are as follows:

"1. *Korean Conflict*.

"The Korean conflict began on June 24, 1950. Truce negotiations started on July 10, 1951. An armistice was formally concluded on July 27, 1953. With this exception, the United States has not been involved in war or armed conflict since September 30, 1949.

"2. *Government Control of Production, Distribution and Prices of Aluminum since September 30, 1949*.

"(a) The Defense Production Act of 1950 was enacted by Congress on September 8, 1950, 50 U.S.C.A.Appendix, § 2061 et seq., and subsequently amended from time to time. Pursuant to general authority in that Act to control production, distribution and prices, the Government first provided a priority system and control of inventories in order to channel aluminum into defense needs, essential civilian purposes, and less essential civilian purposes, in that order. The first of the regulations issued by the

National Production Authority providing for these controls became effective on September 18, 1950. Under these regulations, aluminum remaining after allowing for requirements of National Defense was distributed on an historical basis, purchasers being permitted to use stated percentages of average monthly use during the base period of January 1, 1950– June 30, 1950.

"(b) Subsequently, the Controlled Materials Plan supplemented the system of priorities, effective with respect to deliveries in the third calendar quarter of 1951 and subsequent calendar quarters. Under the Controlled Materials Plan, production schedules were promulgated for the producers of aluminum by Government authority, and production and fabrication of forms of aluminum were permitted as to form and amount only in accordance with such schedules, which were issued upon a determination by Government authority of the requirements of consumers for aluminum.

"(c) The Controlled Materials Plan continued in effect through the second calendar quarter of 1953, when it was replaced by the so-called Defense Materials System. This system covered only military and atomic energy requirements and began with respect to deliveries in the third calendar quarter of 1953 and continues to the present time. Under the Defense Materials System, certain quantities of aluminum are directed by Government authority to be set aside for military and atomic energy requirements. Authorized purchases for these purposes take precedence over purchases of aluminum for any other purpose. The aluminum set aside for military and atomic energy requirements under the Defense Materials System has been decreasing in recent calendar quarters but, in general, has constituted approximately 10% of the supply of aluminum.

"(d) Pursuant to authority contained in the Defense Production Act of 1950, sales of aluminum and aluminum products were generally subject to Government price regulation between January 26, 1951 and February 28, 1953, during which time two general price increases in aluminum were permitted. The price of 99% minimum average aluminum pig was increased in August 1952 from 18¢ to 19¢ per pound, and in January 1953 the price was further increased to 19.5¢ per pound, along with price increases in other forms of aluminum at both times.

"(e) Apart from the foregoing, there have been no Government controls of production, distribution or prices of aluminum since September 30, 1949.

"3. *Market Conditions since September 30, 1949.*

"From September 30, 1949 until the present time—except during a ten-month period from December 1953 to October 1954, when there was a buyers' market in primary aluminum in the United States, in which the supply exceeded the demand—there has been a sellers' market in primary aluminum in the United States, in which the demand has exceeded the supply, including in the supply imports of aluminum from Canada and elsewhere.

"4. *Government Aids in Expansion of Aluminum Producing Facilities.*

"(a) It was the policy of the executive and legislative branches of the Government during the Korean conflict and for some months thereafter to encourage expansion in the domestic aluminum smelting capacity. Such encouragement took two forms: (1) rapid tax amortization, whereby recipients of certificates of necessity granted by an executive agency were authorized for tax purposes to amortize a substantial portion (commonly 80 to 85%) of the cost of new facilities over a five-year period, in lieu of being restricted for tax purposes to take depreciation based on the estimated useful life of the facilities, and (2) government supply contracts, wherein the contractor agreed to construct facilities with its own money (Article I) and the Government agreed under certain conditions to guarantee loans obtained by the contractor to construct the facilities (Article X), and to purchase at prevailing prices the equivalent of five years' capacity production of the primary aluminum

facilities to the extent that the contractor did not sell or utilize in its own fabricating operations the output from the newly constructed smelting facilities (Articles I, III 3).

"(b)   A company receiving these Government aids undertook to construct new aluminum smelting facilities, with its own money, of a size and at a location approved by the Government, to give the Government a call on all or any part of the production of such facilities to the extent of the equivalent of five years' capacity production therefrom at prevailing prices (Article III 1 (a) ), and, during such call period, to offer aluminum in pig, ingot or billet form to domestic non-integrated users of aluminum to the extent of two-thirds of the production of such facilities in any quarter-yearly period, less such amount of aluminum as the Government purchased under its call rights (Article III 2 (a)).  The contractor further agreed, for a period of fifteen years after the initial put and call period described above, to offer each year, to nonintegrated domestic users, aluminum pig, ingot or billet in an aggregate amount not less than 25% of the annual capacity of the aluminum smelting facilities constructed pursuant to such contracts (Article VII).

"(c)   The primary aluminum expansion program was closed by the Government on September 22, 1955, acting by Arthur S. Flemming, Director of the Office of Defense Mobilization, after consultation with members of the Defense Mobilization Board.  The reason given by the Office of Defense Mobilization for closing the goal was that the aluminum smelting capacity then existing and anticipated had surpassed the stated objectives of the Government and that such existing and anticipated total capacity appeared sufficient to meet the current stockpile and defense programs of the Government, as well as the needs of the military, military supporting facilities, and the essential civilian economy in the event of a defense emergency.

"(d)   Considerable quantities of primary aluminum, the exact figures being a secret of state, have been purchased by the Government and set aside for military stockpile purposes since the institution of the Government-aided expansion program.  According to the Stockpile Report to the Congress for July–December 1955, submitted by the Office of Defense Mobilization in March 1956, the minimum stockpile objective had been reached for aluminum, a revision of the supply outlook for aluminum, based chiefly on industry projects for expanding production capacity, having made it possible, according to the said Report, during the second half of 1955 to reduce materially the aluminum stockpile objective.  The Defense Mobilization Administrator stated on April 11, 1956, when testifying before the Joint Committee on Defense Production, that achievement of the minimum stockpile objective has made it possible for the Government to forego for the present its right to call a certain amount of aluminum for the stockpile, but that since the long-term stockpile objective had not been reached, the Government would resume calls when it found that it could do so without hurting the civilian economy. ·

"5.   *Expansion of Aluminum Producing Facilities, 1950–1955.*

"(a)   Alcoa

"(i)   In November 1950, Alcoa, at the request of the Government, agreed to reactivate aluminum smelting facilities at Badin, North Carolina, and Massena, New York, capable of producing aluminum at the rate of approximately 158 million pounds per year in the aggregate, and the Government agreed to purchase the aluminum produced by such facilities to a total of 672.5 million pounds, or approximately the production of four years of operation.  The Government agreed to pay the cost of 'high-cost' purchased power necessary for the operation of such facilities above 5 mills per kilowatt hour.  The contract was cancelled as of November 1, 1955, after approximately 617 million pounds had been delivered.

"(ii)   In addition to the reactivation of the above-mentioned stand-by or emergency smelting facilities, Alcoa un-

dertook in 1950 and 1951 a substantial expansion of its facilities, in large part under government supply contracts. This program, as it eventuated, involved an estimated expenditure of approximately $360 million, of which approximately $255 million was for the facilities covered by the government supply contracts. Of the $360 million, over $345 million had been expended as of December 31, 1955.

"(iii)   Alcoa entered into two government supply contracts with the United States, acting through the Administrator of General Services, of the type described in stipulated fact 4, above, dated June 7, 1951, effective December 19, 1950, and October 19, 1951. In these supply contracts Alcoa agreed, among other things, to construct new facilities designed to produce approximately 410 million pounds of aluminum per year (see Table below, 153 F.Supp. 172). Such facilities consisted of two new aluminum smelting plants, one located near Wenatchee, Washington, and the other located near Rockdale, Texas, and two new potlines at the existing smelting plant located at Point Comfort, Texas. Adjacent to the new Rockdale plant, Alcoa has constructed a steam electric generating power plant adapted to the use of lignite as a fuel and intends to construct a plant for the removal of tar and tar derivatives from lignite.

"(iv)   Alcoa's   government   supply contracts also provided for the expansion of alumina producing facilities and bauxite mining operations. They covered a new alumina plant at Bauxite, Arkansas, designed to produce approximately 803 million pounds of alumina annually and new facilities of approximately 340 million pounds annual capacity at the alumina plant at Mobile, Alabama, where Alcoa's expansion was designed, because of technical reasons, to increase its capacity by approximately 438 million pounds annually. The new alumina plant in Arkansas utilizes reserves of low-grade bauxite situated in the vicinity. Bauxite mining and processing operations in Suriname have also been expanded.

"(v)   Alcoa did not call upon the Government to guarantee any loans obtained by Alcoa in connection with construction under the government supply contracts.

"(vi)   Certificates of necessity have been issued, permitting amortization over a five-year period of an estimated $265 million of the cost of the aforementioned facilities added since 1950. Of this sum, approximately $138 million has been amortized through December 31, 1955. Additional facilities estimated to cost $10 million have been certified for similar amortization, but the company has not yet begun construction.

"(b)   Reynolds

"(i) From 1950 through 1955 Reynolds substantially expanded its facilities, in large part under three government supply contracts with the United States, acting through the Administrator of General Services, of the type described in stipulated fact 4 above, dated July 18, 1951, effective as of December 19, 1950, August 24, 1951 and October 22, 1952, effective as of October 11, 1951. In these supply contracts, Reynolds agreed, among other things, to construct new facilities designed to produce approximately 360 million pounds of aluminum per year (see Table below, 153 F.Supp. 172). The facilities embraced by the expansion program included a new reduction plant at Corpus Christi, Texas, with an annual capacity of 160 million pounds, including a gas diesel electric power generating plant capable of generating 189,000 kilowatts, representing an investment of $80 million. In addition, the annual capacity of the Longview, Washington, reduction plant was expanded by 40 million pounds at a cost of approximately $12 million, which sum was advanced by the Government on a loan bearing 4% interest and which was to be retired by metal deliveries over a five-year period. The loan has been paid off. An additional potline was installed at the Jones Mills, Arkansas, reduction plant and additional facilities were added at Jones Mills and Troutdale, Oregon, to increase capacity by 50 million pounds per year. These

increases in Jones Mills and Troutdale involved an investment of approximately $5 million. A new reduction plant was built at Arkadelphia, Arkansas, with a capacity of 110 million pounds per year at a cost of $34 million.

"(ii) Under the government supply contracts, a new alumina plant was constructed at Corpus Christi, Texas, with a capacity of 730 million pounds per year at a cost of $43 million, and the company also expanded the capacity of the Hurricane Creek alumina plant by 220 million pounds per year at a cost of $3 million. Bauxite mining facilities were expanded to supply this capacity.

"(iii) The Government, pursuant to provisions of the government supply contracts, and at the insistence of banks and insurance companies which lent the money, but not at the insistence of Reynolds, guaranteed loans of $76.75 million obtained by Reynolds in October 1952. These loans were refunded in July 1955 and there is no longer any Government guaranty outstanding.

"(iv) In connection with this expansion, certain facilities were certified as necessary in the interest of national defense, permitting the amortization over periods of five years for Federal income tax purposes of percentages averaging 81.7% of the total cost of approximately $194.6 million. As of October 31, 1955, the total unexpended cost of the expansion and improvements then in progress was approximately $59 million. At December 31, 1955, costs in the amount of approximately $64.4 million remained to be amortized for tax purposes.

"(c) Kaiser

"(i) Since 1950, Kaiser has completed a substantial expansion of its facilities, in large part under four government supply contracts with the United States, acting through the Administrator of General Services, of the type described in stipulated fact 4 above, dated February 2, 1951, effective as of December 19, 1950, December 7, 1951, effective as of November 6, 1951, May 1954, effective as of February 28, 1952, and June 23, 1954, effective as of October 31, 1951. The expansion program included the construc-

tion of a new aluminum reduction plant at Chalmette, Louisiana, with a designed capacity of 400 million pounds of primary aluminum per year and an electric power generating plant of 478,200 kilowatt capacity. The estimated capital investment in these facilities was $150 million. At the Mead and Tacoma, Washington, reduction plants, additional facilities were installed to increase the annual capacity of these plants by 56.4 million pounds per year (see Table below, 153 F.Supp. 172).

"(ii) In addition, the expansion program included the construction and installation of facilities for the exploitation of the company's Jamaican bauxite reserves estimated to cost $12 million. The Baton Rouge, Louisiana, alumina plant was modified to permit the use of Jamaican and other bauxite and to expand its capacity to 1,600 million pounds of alumina per year.

"(iii) Substantially all of the facilities were constructed pursuant to certificates of necessity, which permitted the amortization over a five-year period for Federal income tax purposes of approximately $250 million, or about 81% of the cost thereof (exclusive of land). Of this amount, approximately $108 million had been amortized prior to February 29, 1956.

"(iv) Kaiser did not call upon the Government to guarantee any loans obtained by Kaiser in connection with construction under the government supply contracts.

"(d) Anaconda

"Anaconda, owned 95% by Anaconda Copper Company (now Anaconda Company) and 5% by Harvey, completed an aluminum smelter at Columbia Falls, Montana, in 1955, representing an investment of $65.3 million, initial production starting in August and full production being attained in December of that year. The Anaconda plant has an annual capacity of 120 million pounds of primary aluminum. The company received a certificate of necessity giving it the right to amortize 85% of the cost of this facility over a five-year period, but declined a government supply contract of

the character described in stipulated fact 4 above because it did not want the provision requiring it to sell to nonintegrated fabricators. Anaconda purchases its requirements of electric power from Bonneville Power Administration. The company has obtained its alumina requirements from Reynolds under a five-year contract which expires December 1, 1960. Anaconda, in 1956, entered into a contract with Kaiser for the purchase of alumina to commence between July 1958 and January 1961, as more fully described in stipulated fact 11(c). Anaconda has no present plans to manufacture alumina on a commercial basis, nor has it any present plans to expand its reduction capacity. The company cannot presently be characterized as an integrated aluminum producer since it does not have fabricating facilities capable of converting aluminum pig, ingot or billet directly into semi-fabricated aluminum products. As of December 31, 1955, the Anaconda Company (parent of Anaconda Aluminum Company) had a net worth of $701 million and for the year 1955 its gross income before taxes was $152 million and its net income after taxes was $65 million.

"(e) Table of Government-Aided Primary Aluminum Expansion, 1950–1955

| Company and Plant Site | Year of Completion | Annual Contractual Smelting Capacity (Thousands of Pounds) |
|---|---|---|
| Alcoa | | |
| Point Comfort, Texas | 1952 | 70,000 |
| Wenatchee, Washington | 1953 | 170,000 |
| Rockdale, Texas | 1954 | 170,000 |
| | | 410,000 |
| Reynolds | | |
| Jones Mills, Arkansas } Troutdale, Oregon } | 1952 | 50,000 |
| Corpus Christi (San Patricio), Texas { | 1952 1954 | 150,000 { 10,000 { |
| Longview, Washington | 1952 | 40,000 |
| Arkadelphia, Arkansas | 1954 | 110,000 |
| | | 360,000 |
| Kaiser | | |
| Chalmette, Louisiana { | 1952 1953 | 200,000 { 200,000 { |
| Mead, Washington | 1952 | 40,000 |
| Tacoma, Washington | 1952 | 16,400 |
| | | 456,400 |
| Anaconda | | |
| Columbia Falls, Montana | 1955 | 120,000 |

"(f) Production under Government Supply Contracts

"The total amount of aluminum which each of Alcoa, Reynolds and Kaiser is obligated to produce under its government supply contracts,

and, as of September 30, 1955, the approximate amount produced and the approximate amount to be produced, are as follows, stated in thousands of pounds:

|  | Total Obligation | Produced | To be Produced |
|---|---|---|---|
| Alcoa | 2,050,000 | 1,019,495 | 1,030,505 |
| Reynolds | 1,800,000 | 754,326 | 1,045,674 |
| Kaiser | 2,282,000 | 1,016,600 | 1,265,400 |

"6. *Domestic Smelting Capacities as of September 30, 1955.*

"(a) As of September 30, 1955, the annual smelting capacities of domestic primary aluminum producers, based solely upon the capacity of equipment in place, without regard to the availability of economic power, were as follows:

| Company and Plant Site | Plant Capacity (Thousands of Pounds) |
|---|---|
| **Alcoa** | |
| Alcoa, Tennessee | 314,200 |
| Badin, North Carolina | 94,300 |
| Massena, New York | 224,500 |
| Point Comfort, Texas | 190,000 |
| Rockdale, Texas | 200,000 |
| Vancouver, Washington | 190,000 |
| Wenatchee, Washington | 200,000 |
| Total | 1,413,000 |
| **Reynolds** | |
| Listerhill, Alabama | 100,000 |
| Longview, Washington | 100,000 |
| Jones Mills, Arkansas | 194,000 |
| Troutdale, Oregon | 165,000 |
| Corpus Christi, Texas | 160,000 |
| Arkadelphia, Arkansas | 110,000 |
| Total | 829,000 |
| **Kaiser** | |
| Mead, Washington | 350,000 |
| Tacoma, Washington | 66,400 |
| Chalmette, Louisiana | 400,000 |
| Total | 816,400 |
| **Anaconda** | |
| Columbia Falls, Montana | 120,000 |

"(b) The foregoing table reflects such increased capacities over design or original capacities as had been demonstrated by operations as of September 30, 1955.

"7. *Domestic Smelting Facilities to be Added Subsequent to September 30, 1955.*

"(a) Existing Producers

"(i) Alcoa

"A new potline, which was under construction by Alcoa at its Point Comfort, Texas, Works on September 30, 1955, reached full capacity of 40 million pounds per year in 1956. Two additional potlines at the Rockdale, Texas, Works, also under construction on that date, bringing in an additional capacity of 100 million pounds per year, are in operation and will reach full capacity by the end of 1956. The installation of additional pots and certain modifications of existing facilities, now partially accomplished and the balance in progress, at the Vancouver and Wenatchee, Washington, Works, will increase capacity by an additional 22 million pounds per year by the end of 1956. On April 17, 1956, Alcoa announced plans for the construction of a new smelting plant, including 375,000 kilowatt coal-fired electric power generating facilities, near Evansville, Indiana, to have an annual installed capacity of 300 million pounds, at an estimated investment of $80 million. Alcoa expects that this plant will begin operation in 1957 and will be in full operation by the end of 1958, but actual construction work has not begun as of the date of this stipulation. Alcoa is constructing an additional hydroelectric development on the Little Tennessee River estimated to cost $13 million. The foregoing expansion is without Government aids.

"(ii)  Reynolds

"Under an expansion and improvement program in which Reynolds is now engaged, the annual rated capacities of all of its existing smelting plants except Arkadelphia will be increased by an aggregate of 91 million pounds. This additional smelting capacity is expected to come into operation by the end of 1956. In addition, Reynolds plans to construct a new smelting plant at Listerhill, Alabama, with an annual rated capacity of 200 million pounds of primary aluminum. Bids for general construction work have been invited and certain equipment has been ordered. In connection with the construction of this plant Reynolds has entered into a contract with Ford Motor Company for the sale of primary alumi-

num in molten form for a ten-year period beginning in the fall of 1957, which Ford at its option may extend for five years if it does so before the end of 1964. Under the contract Ford may purchase a minimum of 64 million pounds and a maximum of 164 million pounds per year, subject to the terms and conditions of the contract. A contract has been entered into by Reynolds with Tennessee Valley Authority to provide power for this new plant. Under the contract, Reynolds is to receive firm power increasing from 52,000 kilowatts in November 1957 to 225,000 kilowatts beginning in September 1958, and continuing thereafter during the term of the contract, which expires in 1967, with the right in Reynolds to require TVA to continue to supply firm power for an additional term of ten years. These facilities are expected to begin operation in the fall of 1957 and to reach full scale operation during 1958. The foregoing expansion is without Government aids.

"(iii)  Kaiser

"Since September 30, 1955, Kaiser has increased its capacity at the Tacoma, Washington, smelting plant by 10.6 million pounds. It has also announced an expansion of its Mead, Washington, smelting plant by 2 million pounds. The installed capacity of its Chalmette, Louisiana, plant was restated, on the basis of operating results, as 440 million pounds, rather than the 400 million pounds for which it was designed, and Kaiser has, in addition, announced plans for the construction of an additional potline at this plant having a rated capacity of 55 million pounds. Kaiser has announced an expansion program estimated to cost an aggregate of $178 million, including, in addition to the aforementioned expansion of capacity at the Chalmette plant, the construction of a smelting plant at Ravenswood, West Virginia, with an annual rated capacity of 250 million pounds. Power for the proposed new potline at Chalmette will be obtained from existing generating facilities, supplemented by purchases under a long-term contract with Louisiana Power and

Light Company. A thirty-year contract, renewable under certain conditions for two additional five-year periods, with Ohio Power Company will be the source of power for the new Ravenswood smelting plant. As of the date of this stipulation, bids have been invited for the construction of this plant, but ground has not been broken. The entire expansion program is expected to be completed by early 1958. The foregoing expansion is without Government aids.

"(b)   Possible Future Producers

"(i)   Olin

"Olin, a company engaged in the manufacture of chemicals, paper products, small arms and ammunition, and metal products including aluminum extrusions and tubing, has finalized plans for entering the primary aluminum industry with an investment of $89 million. Its new facilities will consist of an alumina plant with an annual capacity of 460 million pounds to cost $20.5 million, a reduction plant having an annual capacity of 120 million pounds to cost $32.2 million, and a rolling mill of 128 million pounds annual capacity to cost $36.3 million. The company has been granted certificates of necessity permitting it to amortize up to 85% of the construction costs of the alumina and reduction plants and up to 50% of the construction costs of the rolling mill and related facilities over a five-year period. It declined a government supply contract because the contract offered did not contain a provision for Government guaranty of loans. All the facilities will be located on the Ohio River, near Clarington, Ohio. The electric power requirements will be furnished under a long-term contract with Ohio Power Company, a subsidiary of American Gas & Electric Company. Pittsburgh Consolidation Coal Company will supply coal for the power generation. Olin has signed a long-term contract for bauxite from Suriname with initial deliveries scheduled for January 1, 1957. The anticipated date of initial production of all three plants is January 1, 1958 and capacity operations are anticipated for April 1, 1958. The construction of these facilities will be financed partly out of the company's own resources and partly through arrangements with an insurance company which has agreed to buy 3¾% 20-year notes of the company. Olin had a net worth as of December 31, 1955 of slightly less than $343 million. During the year 1955 it reported profit from operations and other income of approximately $95 million, and net income after taxes of approximately $44.5 million. Alcoa made the offer to Olin which was directed by the Order entered in this case on April 23, 1954, but it was not accepted. However, on June 16, 1955, Alcoa agreed with Olin to sell it 118 million pounds of aluminum over the period 1955 through 1960.

"(ii)   Harvey

"Harvey, a fabricator of aluminum, including extrusions and forgings, plans to construct an aluminum smelting plant at The Dalles, Oregon, with an estimated annual capacity of 108 million pounds of primary aluminum, at an estimated cost of $65 million. Initial production is scheduled for approximately January 1, 1958, and the plant is scheduled to be in full production later in 1958. Harvey has been granted a certificate of necessity giving it the right to amortize 85% of the cost of these facilities over a five-year period, and has a government supply contract of the type described in stipulated fact 4 above. The contract obligates the Government upon request of Harvey to guarantee loans for the construction of the reduction plant, the alumina plant and the bauxite facilities. Alternatively, the contract provides that Harvey may call upon the Government to make advance payments for the construction of the reduction plant, the alumina plant and the bauxite facilities, with provisions for payment of interest at the rate of 5% per annum and for repayment in full before the expiration of the term of the government supply contract. Harvey has a contract for power with the Bonneville Power Administration. As of September 30, 1955, Harvey had a net worth of slightly less than $25 million and its net sales during the year ended September 30, 1955 amounted to approximately $34 million.

"(c)  Table of Projected Smelting Capacities

"If and when the foregoing expansion is completed, the annual smelting capacities of domestic companies, based solely upon the capacity of equipment in place, without regard to the availability of economic power, and the years in which full production is expected to be attained (designated 1955 if attained at any time before 1956), are as follows:

"(i)  Existing Producers

| Company and Plant Site | Plant Capacity (Thousands of Pounds) | Date |
|---|---|---|
| Alcoa | | |
| Alcoa, Tennessee | 314,200 | 1955 |
| Badin, North Carolina | 94,300 | 1955 |
| Massena, New York | 224,500 | 1955 |
| Point Comfort, Texas | 240,000 | 1956 |
| Rockdale, Texas | 300,000 | 1956 |
| Vancouver, Washington | 195,000 | 1956 |
| Wenatchee, Washington | 217,000 | 1956 |
| New Plant (near Evansville, Indiana) | 300,000 | 1958 |
| Total | 1,885,000 | |
| Reynolds | | |
| Listerhill, Alabama | 140,000 | 1956 |
| Longview, Washington | 108,000 | 1956 |
| Jones Hills, Arkansas | 206,000 | 1956 |
| Troutdale, Oregon | 173,000 | 1956 |
| Corpus Christi, Texas | 183,000 | 1956 |
| Arkadelphia, Arkansas | 110,000 | 1955 |
| New Plant (Listerhill, Alabama) | 200,000 | 1958 |
| Total | 1,120,000 | |
| Kaiser | | |
| Mead, Washington | 352,000 | 1956 |
| Tacoma, Washington | 77,000 | 1955 |
| Chalmette, Louisiana | 495,000 | 1957 |
| New Plant (Ravenswood, West Virginia) | 250,000 | 1958 |
| Total | 1,174,000 | |
| Anaconda | | |
| Columbia Falls, Montana | 120,000 | 1955 |

"(ii)  Possible Future Producers

| Company and Plant Site | Plant Capacity (Thousands of Pounds) | Date |
|---|---|---|
| Olin | | |
| Clarington, Ohio | 120,000 | 1958 |
| Harvey | | |
| The Dalles, Oregon | 108,000 | 1958 |

"(d)  Fuel for Power Generation

"Since 1950, a substantial part of the expansion of aluminum smelting capacity has been based on electric power generated in facilities fired by natural gas. A substantial part of the smelting capacity to be constructed subsequent to September 30, 1955 will rely upon coal as a source of energy for the generation of electric power.

"8. *Capacity and Planned Expansion of Smelting Facilities in Canada.*

"(a) Aluminium Limited

"The installed capacity of the Canadian smelters of Limited as of the end of 1955 was 1,300 million pounds per year. An additional smelter now under construction at Isle Maligne will add 44 million pounds of capacity annually when it comes into operation, which is expected to be in the summer of 1956. In 1955, Limited announced plans to increase capacity at the Kitimat smelter by 480 million pounds in successive stages through 1959. Under the plan, one potline, having an annual capacity of 60 million pounds, was placed in operation in April 1956, and two additional potlines, with a proposed combined annual capacity of 120 million pounds, are scheduled to be placed in operation by the end of 1956. The company is negotiating with the Government of the Province of Quebec for rights to develop further water power, which would permit an increase in capacity in the Saguenay area of 240 million pounds per year. Preliminary engineering studies have been completed, but rights to the water power have not yet been granted by the Government.

"(b) Canadian British Aluminium Company Limited

"Canadian British Aluminium Company Limited is owned jointly by The British Aluminium Company Limited, an integrated producer and fabricator of aluminum in the United Kingdom, and Quebec North Shore Paper Company, a part of the Chicago Tribune group. The company has announced plans to build a smelter at Baie Comeau, Quebec, to have an ultimate annual capacity of 358.4 million pounds, in four equal stages. The first stage is expected to go into production in 1957 and the second stage is expected to go into production during the winter of 1958–1959. No firm decision has been reached in respect to the third and fourth stages. Work has commenced on the site and certain contracts have been placed. It is intended by the company that the initial production will be used very largely for fulfilling the aluminum requirements of the parent, The British Aluminium Company Limited. The company stated that it would plan to sell the remainder of the product in the world markets, including the United States market, but that these sales will be influenced by price and commercial considerations pertaining at the time in the various markets available.

"9. *Applicants for Entry into Government-aided Aluminum Smelting Program, 1950–1955.*

"(a) Apex

"(i) In 1951, at the beginning of the Government program for the expansion of the aluminum industry, Apex Smelting Company obtained a letter of intent for a government supply contract of the type specified in stipulated fact 4 above from the General Services Administration and a certificate of necessity for the construction of primary aluminum smelting facilities having an annual capacity of 108 million pounds and alumina production facilities having an annual capacity of 250 million pounds, together with gas-fired electric power generating facilities, in the Texas Gulf area. Apex estimated that its facilities for the production of alumina and the smelting of aluminum would cost $85 million.

"(ii) Negotiations were conducted with the Government concerning the terms of Government assistance to the company's entry into the production of primary aluminum. Apex carried other negotiations up to the final contract stage for the purchase of land, for a power supply and for construction of the plants. Subsequently, Apex finally abandoned the entire project.

"(iii)  The company stated that, as a nonintegrated producer, it could not sell primary aluminum to the Government stockpile at a profit at the then prevailing price of 18 cents a pound under the cost of constructing new plants in 1951. The letter of intent contained provisions for purchase and sale of the production from the proposed smelting plant such as are described in connection with government supply contracts in stipulated fact 4 above.

"(iv)  Apex proposed to the Government that the letter of intent be amended so that: (1) the price of pig purchased by the Government would be equal to Apex's cost of production including normal depreciation plus a negotiated fair profit; (2) Apex be permitted to borrow the working capital which would be included in the loan guaranteed by the Government, Apex's contribution to the enterprise to be $2 million in equity capital; and (3) the Government's charge for the loan guaranty be so limited that the over-all cost to Apex including interest and guaranty would not exceed 4%. When such amendments were declined by the Government, Apex declined the letter of intent.

"(v)  Apex has indicated that although primary aluminum prices have increased by 6 cents a pound since 1951, thus providing a better profit margin, it could not seriously consider entering the industry at this time without Government assistance to the extent of accelerated amortization and a government supply contract.

"(vi) Apex, founded in 1923, is a producer of secondary aluminum ingot and operates secondary aluminum smelting plants in Chicago, Illinois, and Cleveland, Ohio. At the time the company was negotiating with the Government, it had an annual capacity for the production of 140 million pounds of secondary aluminum ingot. The company also produces magnesium and zinc alloys. As of December 31, 1951, it had a net worth of $4.3 million and for the year 1951 its earnings before taxes were $1.6 million and after taxes were $637,000.

"(b)  Wheland

"Early in 1953, The Wheland Company, a manufacturer of oil field equipment, sawmill machinery, automotive castings, and artillery, obtained from the Government certificates of necessity covering 85% of the cost of facilities for the production of alumina, the generation of electric power and the smelting of primary aluminum. The certificates, which were issued in March, 1953, embraced smelting facilities of 100 million pounds of annual capacity, together with electric power generating facilities, having an aggregate estimated cost of approximately $35.5 million, and facilities for the production of 438 million pounds of alumina per year which, together with attendant power facilities, had an approximate cost of $22.2 million. The company employed a firm of consulting engineers to draw plans, estimate the cost of constructing the facilities, and obtained estimates of the cost of operating these facilities. Surveys were also made to determine the best location for the alumina and the smelting plants and efforts were made to obtain private financing. The Government offered a government supply contract of the general type described in stipulated fact 4 above except that it did not contain a loan guaranty provision. The company has indicated that the capacity of the smelting plant contemplated by it was 170 million pounds per year and the estimated cost of the alumina and the reduction plants was approximately $85 million. The inability of the company to obtain financing caused it to abandon its efforts to enter the industry. As of October 31, 1952, Wheland had a net worth of $3.1 million, and had net profits after taxes for the six months ended October 31, 1952 of $202,000.

"(c)  St. Joseph

"(i)  On May 16, 1955, St. Joseph Lead Company and Pittsburgh Consolidation Coal Company jointly filed an application with the Government for a tax amortization certificate covering the construction of primary aluminum facilities, adjoining its zinc smelting plant at Jo-

sephtown, Pa., with an annual capacity of 132 million pounds at a cost of $48.8 million and electric power generating facilities of 225,000 kilowatts capacity estimated to cost $36.2 million. During 1955, engineering studies were made of the power plant, the aluminum reduction plant, and of the economic phases of the project. Shortly after the company filed its request for a tax amortization certificate, the Office of Defense Mobilization terminated its aluminum expansion program, which action foreclosed any opportunities for obtaining Government assistance in connection with the construction of aluminum facilities. As of the date of this stipulation the company's aluminum project is being held in abeyance pending further study.

"(ii) St. Joseph, one of the largest domestic producers of lead and zinc, had a net worth of $69.5 million as of December 31, 1955, and during 1955 its income before taxes was $19.2 million, and its net income after taxes was $12.7 million. Its prospective partner in this venture, Pittsburgh Consolidation Coal Company, one of the largest producers of bituminous coal in the United States, had a net worth of $194.8 million as of December 31, 1955, and during 1955 its income before taxes was $19.4 million, and its net income after taxes was $13.9 million.

"(d) Revere

"(i) On August 2, 1955, Revere Copper and Brass, Incorporated, filed an application with the Government for tax amortization certificates covering the construction of a smelting plant of 120 million pounds annual capacity and an alumina plant of 240 million pounds annual capacity, having a combined cost of $52.8 million. As in the case of St. Joseph, Revere's application was rejected because of the termination of the Government's aluminum expansion program. The company has stated that its inability to obtain a certificate of necessity puts it in a very disadvantageous position with respect to every company now in the aluminum field as well as those who have announced their entry into the business,

since, the company stated, all of these companies have obtained tax amortization benefits, and in many cases, many other incentives. The result of this disparity, the company asserts, is that it may encounter difficulties in arranging financing.

"(ii) Revere has not abandoned the idea of entering the primary aluminum field and is continuing its study of matters relevant thereto but it views its position as being inferior to that held by the companies that have obtained various forms of Government assistance.

"(iii) Revere, a fabricator of various mill products of non-ferrous metals and steel, had a net worth of $74.3 million as of December 31, 1955, and during 1955 its income before taxes was $25 million, and its net income after taxes was $11.3 million.

"10. *Alumina Capacities of Alcoa, Reynolds and Kaiser as of September 30, 1955.*

"The annual capacities of Alcoa, Reynolds and Kaiser to produce alumina as of September 30, 1955, were as follows:

| | |
|---|---|
| Alcoa | 3,212 million pounds |
| Reynolds | 2,190 million pounds |
| Kaiser | 1,600 million pounds |

"During the first nine months of 1955, all of the alumina used at smelting plants of Alcoa came from Alcoa's own alumina plants; all of the alumina used at smelting plants of Reynolds came from Reynolds' own alumina plants; and all of the alumina used at smelting plants of Kaiser came from Kaiser's own alumina plants, except for a minor amount which it acquired from others, constituting less than 1% of the total amount of alumina consumed at its smelting plants.

"11. *Planned Expansion of Alumina Facilities by Alcoa, Reynolds and Kaiser.*

"(a) Alcoa

"Alcoa announced on April 7, 1956, plans for the construction of an alumina plant near Point Comfort, Texas, costing more than $45 million, with an estimated capacity of 1 billion pounds of alumina

per year. Ground was broken in February 1956, and contracts have been let. It is expected that the plant will be in full production by the end of 1958.

"(b) Reynolds

"Reynolds' expansion program includes increasing the annual rated capacity of its Corpus Christi, Texas, alumina plant by 365 million pounds. Construction began in March 1956, and is expected to be completed in June 1957.

"(c) Kaiser

"In December 1955, Kaiser announced plans to construct an alumina plant at Gramercy, Louisiana, with capacity sufficient to supply 600 million pounds of alumina annually for Kaiser's reduction plants and 260 million pounds of alumina annually to fulfill a contract with Anaconda. The said contract provides for the purchase by Anaconda of a minimum of 1,700 million pounds of alumina within a fifteen-year period, to commence between July 1958 and January 1961, at a rate not in excess of 260 million pounds annually. The contract further provides that after the minimum tonnage has been delivered, Anaconda may purchase up to 260 million pounds annually for not to exceed an additional five-year period or the expiration of the fifteen-year term of the contract, whichever period first expires. Anaconda will make an unsecured advance of $17 million to Kaiser at 3% interest under this contract, to be liquidated by applying thereto a portion of the sales price of alumina delivered, with provision for repayment of any balance not so liquidated. Ground has been broken and construction of this plant has begun.

"12. *Reserves of Bauxite—Alcoa, Reynolds and Kaiser.*

"(a) Alcoa, Reynolds and Kaiser each has its own reserves of bauxite.

"(b) Alcoa's reserves in Suriname are estimated to be sufficient to supply the needs and commitments of the company during the term of the concessions by which those reserves are held. Such term expires on December 31, 1988. Alcoa has proven reserves of low grade bauxite in Arkansas sufficient to satisfy the current needs of its alumina plant in Arkansas for at least forty years. Alcoa, in addition, has relatively small reserves of high grade bauxite in Arkansas and holds extensive deposits of bauxite under concession from the Dominican Republic.

"(c) Reynolds has proven bauxite reserves estimated to be sufficient to provide seventy-five years' capacity operation of its present and proposed primary aluminum plants. Such reserves are in Jamaica, Arkansas, British Guiana and Haiti.

"(d) Kaiser has bauxite reserves sufficient for more than thirty-five years' capacity operation of all of its primary aluminum plants upon completion of its current expansion program. Such reserves are held by it in Jamaica. Kaiser's purchases of bauxite from Alcoa during the years 1952, 1953, 1954 and the first nine months of 1955 were as follows:

| Year | Long Tons |
|---|---|
| 1952 | 965,390 |
| 1953 | 509,317 |
| 1954 | 616,378 |
| 1955 (9 months) | 351,245 |

"(e) During the first nine months of 1955, the bauxite consumed at the alumina plants of each of those three companies, separated between that coming from the company's own reserves and that purchased from others, was as follows:

| | From Company's Own Reserves | | Purchased from Others | |
|---|---|---|---|---|
| | Long Tons | Percentage | Long Tons | Percentage |
| Alcoa | 1,936,332 | 97.3 | 52,997 | 2.7 |
| Reynolds | 1,171,978 | 78.9 | 314,248 | 21.1 |
| Kaiser | 924,454 | 70.2 | 393,293 | 29.8 |

"13. *Fabricating Capacities of Alcoa, Reynolds and Kaiser as of September 30, 1955.*

Precise figures as to fabricating capacities are difficult to ascertain. The capacity of equipment for fabricated products depends to a great extent upon the pattern of business. In addition, capacities are overlapping in some instances in that some products are at one and the same time finished products for some purposes and semi-finished for others. Stated on the basis of capacities which are not duplicated and on an average pattern of business, the annual fabricating capacities of Alcoa, Reynolds and Kaiser as of September 30, 1955, for the manufacture of all forms of aluminum which they sell, other than pig, ingot and billet, and the percentage of total capacity represented by capacity to produce each fabricated product were as follows:

| Product | Alcoa | | Reynolds | | Kaiser | |
|---|---|---|---|---|---|---|
| | Thousands of Pounds | Percentage | Thousands of Pounds | Percentage | Thousands of Pounds | Percentage |
| Sheet | 630,000 | 43.9 | 382,300 | 55.1 | 372,000 | 60.1 |
| Extruded shapes and tubing | 222,560 | 15.5 | 90,000 | 13.0 | 42,000 | 6.8 |
| Wire, rod, bar and rolled structural shapes | 128,000 | 8.9 | 36,000 | 5.2 | 120,900 | 19.5 |
| Electrical conductor cable | 126,000 | 8.8 | 77,500 | 11.1 | 50,800 | 8.2 |
| Cable accessories | 7,200 | .5 | — | | — | |
| Foil | 48,000 | 3.3 | 90,500 | 13.0 | 18,000 | 2.9 |
| Forgings | 66,940 | 4.7 | — | | 9,000 | 1.5 |
| Powder and paste | 9,640 | .7 | 18,000 | 2.6 | — | |
| Welded tubing | 18,000 | 1.2 | — | | 6,000 | 1.0 |
| Sand castings | 32,650 | 2.3 | — | | — | |
| Permanent mold castings | 60,220 | 4.2 | — | | — | |
| Die castings | 19,580 | 1.4 | — | | — | |
| Rivets | 6,630 | .5 | — | | — | |
| Screw machine products | 2,854 | .2 | — | | — | |
| Collapsible tubes | 1,300 | .1 | — | | — | |
| Impact extrusions and customers' blanks | 17,084 | 1.2 | — | | — | |
| Cooking utensils | 29,200 | 2.0 | — | | — | |
| Jobbing | 8,800 | .6 | — | | — | |
| Total | 1,434,658 | 100.0 | 694,300 | 100.0 | 618,700 | 100.00 |

"14. *Scheduled Additions to Fabricating Capacities—Alcoa, Reynolds and Kaiser.*

"As of September 30, 1955, Alcoa had under construction additional capacity scheduled to be completed as follows:

| Product | Thousands of Pounds | Date of Scheduled Completion |
|---|---|---|
| Sheet | 124,300 | 1957 |
| Die castings | 1,340 | 1956 |
| Foil | 32,640 | 1956–57 |
| Welded tubing | 4,200 | 1956 |
| Forgings | 840 | 1956 |
| Rivets and nails | 54 | 1956 |

"As of September 30, 1955, Reynolds had scheduled expansion as follows:

| Product | Thousands of Pounds | Date of Scheduled Completion |
|---|---|---|
| Extruded shapes and tubing | 21,000 | 1956 |
| Foil | 13,800 | 1955–56 |

"As of September 30, 1955, Kaiser had scheduled expansion as follows:

| Product | Thousands of Pounds | Date of Scheduled Completion |
|---|---|---|
| Sheet | 333,500 | 1957 |
| Extruded shapes | 22,000 | 1957 |
| Foil | 13,500 | 1957 |
| Electrical conductor cable | 10,000 | 1956 |
| Welded tubing | 16,800 | 1956 |
| Food containers | 9,200 | 1956 |

"15. *Growth in the Number of Firms Using Aluminum.*

Throughout the years, the volume of the aluminum industry as a whole and of each branch thereof has grown continuously and rapidly. In addition to the increase of old uses, new uses are found constantly. Except for iron and steel, the quantity of aluminum used per year now exceeds the quantity of any other metal used in the United States. According to surveys made by the trade publication Modern Metals, the number of companies engaged in casting, fabricating, processing and consuming aluminum, magnesium and titanium were approximately as follows:

| | |
|---|---|
| 1949 | 14,000 |
| 1951 | 17,000 |
| 1953 | 21,000 |
| 1955 | 24,000 |

"In recent years it is estimated that about 1500 new firms have been entering the light metals industry per year.

"16. *Primary Aluminum Prices.*

"(a) The following aluminum prices have been announced, on the stated dates, by Alcoa, Reynolds, Kaiser and Limited, respectively, the price of 99% minimum average pig having been $.16, and of 99%-plus ingot having been $.17, on January 1, 1949:

### 99% Primary Aluminum. Pig (Min. Average)

| Price | Alcoa Date | Reynolds Date | Kaiser Date | Limited Date |
|---|---|---|---|---|
| $ .165 | May 22, 1950 | May 23, 1950 | May 25, 1950 | May 23, 1950 |
| .18 | Sept. 25, 1950 | Sept. 29, 1950 | Sept. 28, 1950 | Sept. 25, 1950 |
| .19 | Aug. 4, 1952 | Aug. 4, 1952 | Aug. 4, 1952 | Aug. 7, 1952 |
| .195 | Jan. 23, 1953 | Jan. 23, 1953 | Jan. 22, 1953 | Jan. 23, 1953 |
| .20 | July 15, 1953 | July 20, 1953 | July 20, 1953 | July 21, 1953 |
| .205 | Aug. 5, 1954 | Aug. 6, 1954 | Aug. 6, 1954 | Aug. 6, 1954 |
| .215 | Jan. 13, 1955 | Jan. 10, 1955 | Jan. 12, 1955 | Jan. 14, 1955 |
| .225 | Aug. 1, 1955 | Aug. 6, 1955 | Aug. 2, 1955 | Aug. 8, 1955 |
| .24 | Mar. 29, 1956 | Mar. 27, 1956 | Mar. 26, 1956 | Mar. 31, 1956 |

### 99%-Plus Primary Aluminum Ingot (30 Pounds)

| Price | Alcoa Date | Reynolds Date | Kaiser Date |
|---|---|---|---|
| $ .175 | May 22, 1950 | May 23, 1950 | May 25, 1950 |
| .19 | Sept. 25, 1950 | Sept. 29, 1950 | Sept. 28, 1950 |
| .20 | Aug. 4, 1952 | Aug. 4, 1952 | Aug. 4, 1952 |
| .205 | Jan. 23, 1953 | Jan. 23, 1953 | Jan. 22, 1953 |
| .215 | July 15, 1953 | July 20, 1953 | July 20, 1953 |
| .222 | Aug. 5, 1954 | Aug. 6, 1954 | Aug. 6, 1954 |
| .232 | Jan. 13, 1955 | Jan. 10, 1955 | Jan. 12, 1955 |
| .244 | Aug. 1, 1955 | Aug. 6, 1955 | Aug. 2, 1955 |
| .259 | Mar. 29, 1956 | Mar. 27, 1956 | Mar. 26, 1956 |

"(b) Reynolds, in announcing its price increase of March 27, 1956, stated that the task of financing new capacity is more difficult because aluminum prices have lagged far behind the cost of new plants, the prices for the materials used in the production of aluminum, and the rise in freight rates. Large amounts of capital are needed, according to Reynolds for primary aluminum plants. The cost of new facilities from ore to pig stage today is about $1500 per ton of capacity or four times the per ton cost in 1939, Reynolds stated, and in this same period of time, the price of aluminum has reflected an increase of only 20%. Reynolds further stated that another factor which has complicated the problem of financing new capacity is the withdrawal of governmental incentives to further expansion, such as accelerated amortization and stockpile supply contracts. It was Reynolds' view that by making it possible to increase the supply of aluminum more rapidly and more substantially, this price increase is the most effective long-range safeguard of a relatively low price for aluminum products far into the future.

"(c) Alcoa's pricing policy has been predicated upon the objective of obtaining a return, under normal expected loads in the plants, of 15 to 20% on the capital used in connection with the production of each aluminum product. This return has not always been realized. This policy has resulted over a long period of years in a profit to the company after taxes of about 10% on the equity capital in the business. With respect to the smelting plants erected by Alcoa under its first government supply contract, Alcoa estimated that its annual profits on the 240 million pounds of aluminum capable of being produced at these plants would be $3,840,000 or 1.6 cents per pound. This estimated profit, which represented 3% of the $135.5 million invested in these facilities and reflected earnings before the payment of Federal taxes, was based on 20-year depreciation with interest on the total capital investment of 3% per annum. In 1951, Alcoa indicated that it would not expect

to make any profit on the output of these plants at an 18 cent price for aluminum pig during the five-year period of accelerated tax amortization, but would make a profit after that.

"17.  *Prices of Certain Metals Other Than Aluminum.*

"As of March 16, 1956, base prices per pound of certain metals other than aluminum were:

Copper, electrolytic (delivered any U. S. destination) ........46.0¢
Lead, pig-common (New York) ..........................16.0
Zinc, prime western slab (East St. Louis) ................13.5
Steel billets, bessemer and open hearth (Pittsburgh) ....... 3.4

"18.  *Long-Term Debt—Alcoa, Reynolds and Kaiser.*

"(a) The long-term debt (debt having an original maturity of more than one year) as of September 30, 1955, and the weighted average effective interest rate to maturity of Alcoa, Reynolds and Kaiser, were as follows:

|  | Millions of Dollars | Effective Interest Rate to Maturity |
|---|---|---|
| Alcoa | $312.3 | 3.03 % |
| Reynolds | 247.7 | 4.335 |
| Kaiser | 160.1 | 3.776 |

"(b) Except for mortgages on houses representing a small portion of Alcoa's long-term debt, none of that debt was secured.  Of Alcoa's unsecured long-term debt, $220.85 million consisted of sinking fund debentures and the balance consisted of promissory notes and serial notes.

"(c) $155 million of Reynolds' long-term debt was secured by a lien on substantially all property, plant and equipment of Reynolds and on holdings of Reynolds of the capital stock of three wholly-owned subsidiary companies. Slightly in excess of $10 million of Reynolds' long-term debt represents advances from the Economic Cooperation Administration, a Government agency, for the development of bauxite ore deposits in Jamaica.  The agreements covering Reynolds' first mortgage bonds, series A due 1980, and notes payable to banks, due 1956–60, impose restrictions on cash dividends on common stock so long as any of such debt is outstanding.  For the years 1955 through 1957 common stock dividends are limited to the lesser of one-third of consolidated net earnings, as defined, or $7 million in any one year. In addition, the company may not pay such dividends as would reduce consolidated net current assets to less than $65 million to June 30, 1956, $75 million from July 1, 1956 to June 30, 1957, and $85 million thereafter.

"(d) Of the Kaiser long-term debt, $104 million was secured by a lien on substantially all of the plant and properties now owned or hereafter to be acquired, except properties located outside the United States.  The agreements covering Kaiser's first mortgage bonds, 3⅝% and 4½% series due 1976, impose restrictions on the payment of dividends on the basis of the formula set forth in the agreements.

"(e) Except as stated above, none of the Alcoa, Reynolds or Kaiser debt is owing to or guaranteed by the United States or any agency or instrumentality thereof.

"19.  *Long-Term Debt Compared to Net Worth.*

"The net worth of each of Alcoa, Reynolds and Kaiser, expressed as a percentage of its long-term debt, was, as of September 30, 1955, as follows: Alcoa, 159%;  Reynolds, 61%;  and Kaiser, 87%.

"20.  *Long-Term Debt Compared to Total Assets.*

"Total assets of Alcoa as of September 30, 1955, were $1,004,885,567.  Such as-

sets were 3.2 times Alcoa's long-term debt as of September 30, 1955. Total assets of Reynolds as of October 31, 1955 were $471,050,244. Total asets of Kaiser as of May 31, 1955 were $372,115,495, and as of February 29, 1956 were $443,-072,575. On the basis of these asset values, it appears that the ratios of total assets to long-term debt of Reynolds and Kaiser as of September 30, 1955, were substantially the same as the ratios which prevailed on September 30, 1949,

the said ratios having been 1.8 and 2.3, respectively.

**"21. Current Asset Ratios—Alcoa, Reynolds and Kaiser.**

"The ratios of total current assets to total current liabilities of Alcoa, Reynolds and Kaiser as of the end of their respective accounting years (December 31 for Alcoa and Reynolds, May 31 for Kaiser), 1949 through 1955 (Alcoa and Reynolds as of September 30, 1955), were as follows:

|  | Alcoa | Reynolds | Kaiser |
|---|---|---|---|
| 1949 | 2.5 | 2.10 | 2.769 |
| 1950 | 2.5 | 2.21 | 2.587 |
| 1951 | 1.4 | 2.01 | 2.329 |
| 1952 | 1.7 | 2.60 | 3.728 |
| 1953 | 1.5 | 2.72 | 1.904 |
| 1954 | 2.3 | 2.45 | 1.97 |
| 1955 | 2.7 | 3.10 | 2.21 |

**"22. Total Aluminum Sales—Alcoa, Reynolds and Kaiser.**

"Total sales of all products by Alcoa, Reynolds and Kaiser, excluding only non-aluminum products, during the period 1949 through the first nine months of 1955, in millions of dollars were as follows:

|  | Alcoa | Reynolds | Kaiser |
|---|---|---|---|
| 1949 | $261.0 | $128.3 | $ 64.1 |
| 1950 | 390.0 | 162.8 | 99.4 |
| 1951 | 424.8 | 209.2 | 125.1 |
| 1952 | 462.6 | 229.6 | 144.2 |
| 1953 | 593.0 | 282.6 | 216.8 |
| 1954 | 608.0 | 301.9 | 228.5 |
| 1955 (9 mos.) | 567.9 | 280.4 | 214.8 |

**"23. Financing of Expansion Program.**
**"(a) Alcoa**

"To finance its expansion program, begun in 1951, involving the construction of facilities under the two Government supply contracts, as well as other construction, Alcoa, during 1951–52, increased its long-term debt by $225 million, comprising $100 million of 3% installment notes issued to banks, and $125 million of 3⅛% sinking fund debentures, due 1964, which were sold in a public offering in January 1952. The expansion in facilities involved two additional potlines at the Point Comfort smelting plant, new smelting plants at

Wenatchee, Washington, and Rockdale, Texas, a new alumina plant at Bauxite, Arkansas, enlargement of the Mobile, Alabama, alumina plant, the enlargement of bauxite mining and processing operations in Suriname, and the installation of a large extrusion press at Lafayette, Indiana, large forging presses at Cleveland, and a new mill for rolling tapered aluminum sheet at Davenport, Iowa, all of which fabricating facilities were leased from the United States Air Force, together with other changes and additions in Alcoa's fabricating operations. The expansion program, which originally was estimated to involve the

expenditure of approximately $330 million, but which estimate was subsequently increased to $360 million, neared its final stages in 1954. Late in 1953 and early in 1954 the company made temporary bank borrowings of $30 million to replace working capital which had been used in the expansion program. These temporary borrowings were repaid and additional funds were received from the borrowing of $75 million from a number of banks in March 1954. In June 1954, $100 million of 3% sinking fund debentures, due 1979, were publicly offered, the proceeds of which were used to pay off the $75 million bank loans and to provide funds for capital expenditures and additional working capital. The company has stated that if it proceeds with planned expansion of alumina and aluminum smelting facilities, it may have to borrow as much as $150 million in 1957, some or all of which may be on long term.

"(b) Reynolds

"(i) To finance the expansion of its facilities under the government supply contracts, Reynolds sold in 1951 $85 million of 4% first mortgage bonds due July 1, 1962 to a group of insurance companies at par. These bonds were secured by a mortgage on the expanded facilities, including the new reduction plant at Corpus Christi which cost $80 million (including the electric power plant) and the new facilities at Jones Mills and Troutdale which cost $5 million. These bonds were to be retired within five years. The expansion of the company's Longview plant and an increase of the capacity of the Hurricane Creek alumina plant, involving approximately $12 million, were financed by an advance of this sum by the Government at a rate of 4% interest and was to be retired by metal deliveries over a five-year period. On October 30, 1952, Reynolds sold $45,750,-000 of 16-year first mortgage bonds and $31 million of 16-year secured notes to a group of life insurance companies and banks in order to finance the cost of the alumina plant built at Corpus Christi and the Arkadelphia, Arkansas, reduction

plant. In the same year (1952) Reynolds negotiated a 2-year loan with a group of banks for $17.5 million, of which $7 million was used to retire a 2¾% bank loan due in 1953 and the remainder was used for the additional working capital necessary to operate the expanded facilities.

"(ii) In 1953, Reynolds indicated that its program of expansion involving $174 million had been accomplished without recourse to the sale of equity securities. Its board of directors was of the opinion that in view of this method of financing, it was essential to maintain a conservative cash dividend policy, supplemented by stock dividends, until a substantial repayment of the debt had been achieved.

"(iii) In 1955, Reynolds' board of directors authorized a $60 million improvement and expansion program to be completed over a three-year period. The funds to be used in financing this program were to be obtained from the company's cash resources and future operations. In July 1955, the company issued $155 million of mortgage obligations and $80 million of notes to a group of financial institutions and simultaneously retired eleven mortgage and note obligations totaling $245 million as of December 31, 1954, which were held by banks, insurance companies, government agencies and others. This simplified the debt structure and permitted the company to proceed with its improvement and expansion program.

"(iv) In February 1956, Reynolds sold 800,000 shares of Cumulative Preferred Stock, 4¾%, Series A, par value $50 per share, in a public offering. The net proceeds from the sale of this stock, together with funds to be obtained on or before April 1, 1957 from the sale of $60 million First Mortgage Bonds, Series B, due 1981 (4¼%) to institutional investors and the borrowing of $15 million from banks on notes due 1959–1961 at 3¾% interest, were proposed by Reynolds to be added to the cash resources of the company and applied as needed to the construction of new facilities estimated to cost approximately $114 million.

"(c) Kaiser

"(i) To finance the expansion of its facilities under the several supply contracts and to provide capital for other facilities, Kaiser in the fiscal year 1950–1951 arranged for $115 million of private financing. Part of this financing was to be used to pay the Government the remainder owed on five plants and the balance for expanding the company's primary aluminum capacity by 200 million pounds under the government supply contract. As a part of this financing program, in February 1951, Kaiser entered into agreements with eighteen insurance companies for them to purchase an aggregate $75 million principal amount of First Mortgage Bonds, 3⅝% series due 1976, and with eight banks providing for loans totaling $40 million, bearing 3⅛% interest. Approximately $37.6 million of the $115 million obtained by this financing was used to discharge the Government 4% purchase-money loans arising from the company's purchase of five major aluminum plants.

"(ii) In January 1952, Kaiser obtained additional financing totaling $101.25 million to complete its expansion program. This financing consisted of $29 million in long-term bonds purchased by twelve institutional investors; $93.5 million in loans by twelve banks, of which $40 million was used to retire previous bank loans arranged as part of the financing of the first phase of expansion; and $18.75 million in preferred stock publicly sold. In February 1953, an additional short-term loan of $12 million was negotiated.

"(iii) In December 1953, the company sold 325,000 shares of 5½% Cumulative Convertible Preferred Stock, at par value of $50 per share, to Kennecott Copper Corporation for investment. The proceeds of $16.25 million completed the program of financing in connection with the construction program undertaken by the company in the spring of 1951. Kennecott also purchased from Kaiser's founding companies 100,000 shares of Kaiser common stock for investment. In April 1955, Kennecott converted all of the 5½% preferred stock it acquired in December 1953 to common shares of Kaiser, and as of March 31, 1956 owned 13.1% of such common shares.

"(iv) In order to provide funds for the construction of the Ravenswood, West Virginia, sheet mill, the participants in Kaiser's term bank loan revised principal payments due on December 1, 1954 and June 1, and December 1, 1955, extending the maturity of the loan from December 1, 1956 to December 1, 1958. The holders of the company's 3⅝% bonds waived, in accordance with the terms of the indenture, sinking fund payments due in 1955, 1956 and 1957 in the aggregate amount of $16.5 million. Of the amount so waived, $8 million will be repaid over the period ending January 1, 1976, and $8.5 million will be due on December 15, 1958.

"(v) In May 1956, Kaiser made a public offering of 300,000 shares of 4⅛% Cumulative Convertible Preference Stock of a par value of $100 per share, the net proceeds from which, together with funds to be obtained from the sale of $120 million of First Mortgage Bonds, 4¼% series due 1981, to institutional investors in installments by September 1957, were proposed by Kaiser to be added to its cash resources and to be applied as needed, together with other funds, to an expansion program. Such expansion program was estimated to cost an aggregate of $178 million.

"24. *Current Capitalization of Alcoa, Reynolds and Kaiser.*

"(a) Alcoa, as of February 29, 1956.

| Title of Issue | Authorized | Outstanding |
|---|---|---|
| Long-Term Debt: | $500,000,000 | |
| 3⅛% Sinking Fund Debentures—due 1964 | | $125,000,000 |
| 3% Sinking Fund Debentures—due 1979 | | 94,445,000 |
| Notes Payable | | |
| 2.55% due 1967 | | 27,500,000 |
| 3%, due 1973 | | 60,000,000 |
| Capital Stock: | | |
| Serial Preferred Stock (par value $100 per share) | 1,000,000 shs. | |
| $3.75 Cumulative Preferred Stock | 660,000 shs. | 659,909 shs. |
| Common Stock (par value $1 per share) | 25,000,000 shs. | 20,430,094 shs. |

"(b) Reynolds, as of December 31, 1955.

| Title of Issue | Authorized | Outstanding |
|---|---|---|
| Long-Term Debt: | | |
| First Mortgage Bonds | | |
| Series A due 1980 (4⅜%) | $155,000,000 | $155,000,000 |
| Series B due 1981 (4¼%) | 60,000,000 | * |
| Notes Payable—Banks | | |
| Due 1956–1960 (4%) | 80,000,000 | 57,500,000 |
| Due 1959–1961 (3¾%) | 15,000,000 | ** |
| Advances by United States Government Agency (ECA) due 1956–1970 (4%) | | 12,195,232 |
| Capital Stock: | | |
| Cumulative Preferred Stock (par value $50 per share) issuable in series | 2,000,000 shs. | |
| Series A Preferred Stock | | *** |
| Common Stock (par value $1 per share) | 12,500,000 shs. | 10,055,065 shs. |

*$60,000,000 will be outstanding, according to commitments, on or before April 1, 1957.

**$15,000,000 will be outstanding, according to commitments, on or before April 1, 1957.

***800,000 shares were issued in February 1956.

"(c) Kaiser, as of February 29, 1956.

| Title of Issue | Authorized | Outstanding |
|---|---|---|
| **Long-Term Debt:** | | |
| First Mortgage Bonds: | | |
| 3⅝% Series due 1976 | $ 75,000,000 | $ 75,000,000 |
| 4½% Series due 1976 | 29,000,000 | 29,000,000 |
| 3¾% Series due 1976 | 40,000,000 | 20,000,000* |
| 4¼% Series due 1981 | 120,000,000 | ** |
| 3⅝% Notes due to Dec. 1, 1958 | 93,500,000 | 29,920,000 |
| Advance under contract | 17,000,000 | None |
| **Capital Stock:** | | |
| Preferred Stock, $50 par value (issuable in series), 1,500,000 shs. authorized 4¾% Cumulative Preferred Stock | 700,000 shs. | 700,000 shs. |
| Preference Stock, $100 par value (issuable in series), 750,000 shs. authorized 4⅛% Cumulative Convertible Preference Stock | 300,000 shs. | *** |
| Common Stock, par value 33⅓¢ per share | 20,000,000 shs. | 14,678,527 shs. |

*A total of $40,000,000 will be outstanding in August 1956 under bond purchase agreements.

**$120,000,000 will be outstanding, according to commitments, **on or** before September 1957.

***300,000 shares were issued in May 1956.

"25. *Arthur V. Davis.*

"On January 16, 1951, Mr. Arthur V. Davis owned 1,841,232 shares (adjusted for the two subsequent two-for-one split-ups), or approximately 9.4% of the common stock of Alcoa. As of March 1, 1956, he owned 1,336,824 shares, or approximately 6.5% thereof. He retired from active participation in the affairs of the company in 1947 and his present position as Chairman of the Board of Alcoa, is honorary. His only activity in connection with the business of the company is to attend annual shareholders' meetings and annual organization meetings of the Board of Directors.

"26. *Aluminium Limited.*

"(a) From the formation of Limited in 1928 until his resignation because of ill health in 1947, Mr. Edward K. Davis, brother of Mr. Arthur V. Davis, was President of Limited. He was succeeded by his son, Mr. Nathanael V. Davis, who is still President of Limited. Limited has no Chairman of the Board.

"(b) The General By-Laws of Limited, as amended, contain the following provisions:

"Article IV

"Officers

"President.

"Section 1. The President shall be the chief executive officer of the Company. He shall preside at all meetings of the shareholders and of the Board of Directors at which he is present. He shall be ex officio a member of all stand-

ing committees. He shall have the custody of the corporate seal or may entrust the same to the Secretary. He shall make reports of the Company's business to the Board of Directors at such times as the Board shall require. He shall perform all the usual duties incident to the office of President.

## "Article VIII

### "Voting Upon Stocks

"Unless otherwise ordered by the Board of Directors, the President of the Company shall have full power and authority in behalf of the Company to attend and to act and vote in person or by proxy at any meetings of shareholders of any corporation or company in which this Company may hold stock, and at any such meeting shall possess or may exercise any and all the rights and powers incident to the ownership of such stock which the owner thereof might possess or exercise if present. The Board of Directors, by resolution from time to time, may confer such powers upon any other officer or person.

"(c) It has been the announced and actual policy of Limited to charge the same price for primary aluminum sold in the United States as is being charged by the United States primary aluminum producers. Limited's price was not changed when the United States customs duties were lowered from the rate of 3¢ per pound, in effect at the end of World War II, to 2¢ in 1948 and to 1½¢ in 1951. The latter rate has continued since then.

"(d) Since the entry of the stock disposal judgment on January 16, 1951 and their subsequent election to the Board of Directors of Limited, the judgment trustees, Dr. Donald K. David and Mr. John L. Sullivan, and Mr. N. Baxter Jackson, Chairman of the Board of, and designated as representative by, the corporate trustee, Chemical Corn Exchange Bank, have been directors of Limited continuously.

"(e) From the formation of Limited in 1928 until the election of the judgment trustees to the Board of Directors in 1951, the Board of Directors of Limited (until then nine in number) has been composed exclusively of top officers of Limited or of wholly-owned subsidiaries of Limited, and changes in the composition of the Board of Directors have taken place only in the case of death or retirement of officers, except as follows: Mr. Leighton McCarthy, who was a director from 1928 until his death in 1952, was one of the legal counsel of Limited, and at one time the Canadian Ambassador to the United States; and in 1955, Field Marshal Earl Alexander of Tunis, a former Governor General of Canada, not an officer of Limited, and Mr. M. B. de Sousa Pernes, a top officer of Limited's British subsidiary, were added to the Board of Directors (now fourteen in number).

"(f) Since the election to the Board of Directors of Limited of the individual judgment trustees and the representative of the corporate trustee, except in one instance of disagreement concerning the area in which aluminum production should be expanded, all action by the Limited Board has been unanimous, differences of opinion among the various directors having been resolved before formal votes were taken. In voting at stockholders' meetings the judgment trustees have cast their ballots in support of the proposals advocated by the management and set forth in its proxy soliciting material.

"(g) Since January 16, 1951, there have been no proxy fights regarding the stock of Limited.

"(h) Except for individuals or institutions which are subject to the judgment of January 16, 1951 with regard to the disposal and/or voting of stock in Limited, there is no single individual or other legal entity which owns or controls as much as 2% of the capital stock of Limited. Thus far, in no private sale of shares of stock of Limited which are subject to disposal under the judgment of January 16, 1951, has any individual or other legal entity bought as much as an aggregate of 50,000 of those shares.

"27. *Disposals of Stock of Aluminium Limited.*

"(a) The shareholders who were required by the judgment on stock disposal entered January 16, 1951, to dispose of their stock in Aluminium Limited have sold 1,760,789 shares and have given away 82,707 shares (both adjusted for the two-for-one split-up of September 1952) as of March 31, 1956. Stock owned at the close of business on March 31, 1956 by those required to sell was as follows:

|  | Shares |
|---|---|
| Arthur V. Davis | 37,119 |
| Arthur Vining Davis Foundation | 15,000 |
| Roy A. Hunt | 49,152 |
| The Hunt Foundation | 15,550 |
| Alfred M. Hunt | 6,000 |
| Richard K. Mellon | 95,729 |
| Richard King Mellon Foundation | 26,400 |
| Sarah Mellon Scaife | 130,594 |
| Sarah Mellon Scaife Foundation | 9,000 |
| Paul Mellon | 197,330 |
| Old Dominion Foundation | 41,000 |
| Ailsa M. Bruce | 109,280 |
| Avalon Foundation | 7,500 |
| Paul J. Urquhart | 339 |
| Total shares | 739,993 |

"(b) The stock owned by those who are not required to sell, but whose voting rights are exercised by the Trustees, was as follows at the close of business on March 31, 1956:

| | Shares |
|---|---|
| Trustees of The Duke Endowment | 270,390 |
| Doris Duke | 180,442 |
| Mellon National Bank and Trust Company, D. D. Shepard and George W. Wyckoff—Trustees for the benefit of Audrey Bruce (Trust No. 360–035) | 38,060 |
| Mellon National Bank and Trust Company, D. D. Shepard and George W. Wyckoff—Trustees for the benefit of Paul Mellon and his heirs (Trust No. 360–036) | 13,781 |
| Mellon National Bank and Trust Company, D. D. Shepard and George W. Wyckoff—Trustees for the benefit of Ailsa Mellon Bruce and her children (Trust No. 360–037) | 102,260 |
| Mellon National Bank and Trust Company, Richard K. Mellon and Alan M. Scaife—Trustees for one or more of the children of Sarah Mellon Scaife (Trust No. 360–077) | 12,540 |
| Mellon National Bank and Trust Company, Richard K. Mellon and Alan M. Scaife—Trustees for one or more of the children of Sarah Mellon Scaife (Trust No. 360–078) | 12,540 |
| Mellon National Bank and Trust Company, Richard K. Mellon and Alan M. Scaife—Trustees for one or more of the children of Sarah Mellon Scaife (Trust No. 360–134) | 12,540 |
| Mellon National Bank and Trust Company, Richard K. Mellon and Alan M. Scaife—Trustees for one or more of the children of Sarah Mellon Scaife (Trust No. 360–135) | 12,540 |
| Wilmington Trust Company, D. D. Shepard and George W. Wyckoff, Trustees for the issue of Ailsa M. Bruce (Trust No. 2213) | 91,640 |
| Wilmington Trust Company, D. D. Shepard and George W. Wyckoff, Trustees for the children of Paul Mellon and of Ailsa M. Bruce (Trust No. 2313) | 117,630 |
| Total shares | 864,363 |

"(c) There were 9,975,690 shares of Aluminium Limited stock outstanding as of December 31, 1955.

"28. Supplementing Stipulated Fact 5(f), the detailed total amount of aluminum which each of Alcoa, Reynolds and Kaiser is obligated to produce under each of its government supply contracts, and, as of June 30, 1956, the detailed approximate amounts produced and to be produced under each of them, and the approximate date as to each of them when the total production obligation thereunder will be completed, are as follows, stated in thousands of pounds:

|  | Total Obligation | Produced | To be Produced | Production Completion Date | |
|---|---|---|---|---|---|
| **Alcoa** | | | | | |
| Contract GS-OOP-(D)-12007 | | | | | |
| Point Comfort ...... | 350,000 | 302,659 | 47,341 | February | 1957 |
| Wenatchee ......... | 850,000 | 636,201 | 213,799 | August | 1957 |
| Contract GS-OOP-(D)-12096 | | | | | |
| Rockdale .......... | 850,000 | 453,096 | 396,904 | August | 1958 |
| | 2,050,000 | 1,391,956 | 658,044 | | |
| **Reynolds** | | | | | |
| Contract GS-OOP-(D)-12202 | | | | | |
| Longview .......... | 200,000 | 137,836 | 62,164 | November | 1957 |
| Contract GS-OOP-(D)-12008 | | | | | |
| Jones Mills, Troutdale, Corpus Christi | 1,000,000 | 647,946 | 352,054 | February | 1958 |
| Contract GS-OOP-(D)-12214 | | | | | |
| Corpus Christi, Arkadelphia ........ | 600,000 | 251,614 | 348,386 | May | 1959 |
| | 1,800,000 | 1,037,396 | 762,604 | | |
| **Kaiser** | | | | | |
| Contract GS-OOP-(D)-12213 | | | | | |
| Mead ............. | 200,000 | 147,208 | 52,792 | September | 1957 |
| Contract GS-OOP-(D)-12006 | | | | | |
| Chalmette .......... | 1,000,000 | 662,252 | 337,748 | January | 1958 |
| Contract GS-OOP-(D)-12192 | | | | | |
| Tacoma ........... | 82,000 | 55,850 | 26,150 | February | 1958 |
| Contract GS-OOP-(D)-12143 | | | | | |
| Chalmette .......... | 1,000,000 | 533,736 | 466,264 | August | 1958 |
| | 2,282,000 | 1,399.046 | 882,954 | | |

"29. Supplementing Stipulated Fact 7(a)(i), Alcoa has begun construction of an additional (seventh) potline at its Point Comfort, Texas, Works, to have an annual capacity of 40 million pounds of aluminum per year, which, it is estimated, will go into production in January 1958.

"30. Supplementing Stipulated Facts 7(b)(i) and 9(d):

"(a) In August, 1956, Olin and Revere formed a new corporation, Olin Revere Metals Corporation (Olin Revere), to be owned 50% by Olin and 50% by Revere, for the purpose of entering into the aluminum smelting industry. The plans for Olin Revere supersede the plans of Olin stated in Stipulated Fact 7(b)(i), except for the rolling mill of 128 million pounds annual capacity referred to there-

in, which it is still intended shall be owned by Olin. The certificate of necessity referred to in Stipulated Fact 7 (b)(i) has been transferred to Olin Revere.

"(b) The facilities of Olin Revere will include: an alumina plant with an annual capacity of 700 million pounds, to be located at Burnside, Louisiana, approximately twenty-five miles south of Baton Rouge; an aluminum reduction plant with an annual capacity of 360 million pounds, to be located at Clarington, Ohio, on the Ohio River; and a power plant to be located across the Ohio River from Clarington at Cresap, West Virginia, consisting of two 225,000 kw generating units, to be owned by a subsidiary of Olin Revere, and a third 225,000 kw generating unit to be owned by Ohio Power Company, a subsidiary of American Gas and Electric Company, all of which generating units will be operated by Ohio Power Company. Coal for the generating units will be supplied from the mine of Pittsburgh Consolidation Coal Company located at the site of the power plant. Bauxite for the alumina plant will be furnished by N. V. Billiton from its mines in Surinam.

"(c) Revere has contracted for 120 million pounds per year of the aluminum to be produced at the new reduction plant, and intends to use that aluminum in its aluminum sheet, tube and extruded shape departments at its Baltimore, Maryland, plant and at its new aluminum sheet plant, known as the Dallas Division, in Chicago, Illinois. Olin has contracted to take 240 million pounds per year of aluminum to be produced at the new reduction plant and intends to use some of that aluminum at the new rolling mill at Clarington, Ohio, and the remainder of it at Olin's midwest and west coast plants.

"(d) The Olin Revere project is expected to cost $231 million, to be supplied as follows: Olin and Revere will each contribute $15.5 million by the purchase of common stock and debentures of Olin Revere, $100 million will be borrowed by Olin Revere from a group of banks, and $100 million will be raised by the sale by Olin Revere to a group of life insurance companies of first mortgage bonds.

"(e) American Smelting and Refining Company, which, together with its subsidiaries, is principally engaged in the custom smelting and refining of nonferrous metals, including production of secondary aluminum from scrap, owns 36.2% of the stock of Revere. American Smelting and Refining Company had a net worth as of December 31, 1955, of approximately $310 million. During the year 1955 it reported net income before taxes of approximately $57 million, and net income after taxes of approximately $34 million.

"31. Supplementing Stipulated Fact 16(a), the price of 99% Minimum average pig was raised to 25¢ by Alcoa, Reynolds, Kaiser and Limited on the following dates:

Alcoa .................August 10, 1956
Reynolds .............August 13, 1956
Kaiser ...............August 11, 1956
Limited ..............August 14, 1956

"The price of 99%-plus ingot was raised to 27.1¢ by Alcoa, Reynolds and Kaiser on the following dates:

Alcoa ................August 10, 1956
Reynolds .............August 13, 1956
Kaiser ...............August 11, 1956

"32. Supplementing Stipulated Fact 17, as of November 27, 1956, base prices per pound of certain metals other than aluminum were:

Copper, Electrolytic (delivered any U. S. destination) ..........36¢
Lead, pig—common (New York) ...........................16¢
Zinc, prime western slab (East St. Louis) .....................13.5¢
Steel billets, bessemer and open hearth (Pittsburgh) ............ 3.7¢

"33. Supplementing Stipulated Fact 25, Mr. Arthur V. Davis sold 150,000 shares of common stock of Alcoa by a public offering on September 12, 1956.

After such sale he owned 1,186,824 shares or approximately 5.8% of the common stock of Alcoa.

"34. (a) Supplementing Stipulated Fact 27(a), the shareholders who were required by the judgment on stock disposal entered January 16, 1951, to dispose of their stock of Aluminium Limited have sold 1,842,101 shares and have given away 88,584 shares (both adjusted for the two-for-one split-up of September 1952) as of September 30, 1956. Stock owned at the close of business on September 30, 1956 by those required to sell was as follows:

|  | Shares |
|---|---|
| Arthur V. Davis | 8,557 |
| Arthur Vining Davis Foundation | 10,000 |
| The Hunt Foundation | 15,725 |
| Alfred M. Hunt | 6,000 |
| Richard K. Mellon | 92,729 |
| Richard King Mellon Foundation | 29,400 |
| Sarah Mellon Scaife | 121,594 |
| Sarah Mellon Scaife Foundation | 18,000 |
| Paul Mellon | 166,880 |
| Old Dominion Foundation | 67,000 |
| Ailsa M. Bruce | 101,580 |
| Avalon Foundation | 15,000 |
| Paul J. Urquhart | 339 |
| Total | 652,804 |

"(b) Supplementing Stipulated Fact 27(b), there was no change as of September 30, 1956, over the figures given as of March 31, 1956, with respect to the stock owned by those who are not required to sell but whose voting rights are exercised by the Trustees under the said judgment on stock disposal."

Jurisdiction

The Government in its moving papers affirmatively disavows that it is seeking further relief in accordance with Section VIII of the final judgment, stating:

"Despite the fact that the experience of the past five years has not provided a well-founded assurance that, in future years, competitive conditions of an effective and lawful nature will be certain to prevail in the aluminum industry, a prayer *for further relief in accordance with Section VIII of the Final Judgment of July 6, 1950,* is not made at this time since such a request would be premature." (Government's motion papers paragraph 21.)

The Government's application is made pursuant to the provisions of Section X of the final judgment of 1950. Section X is the standard anti-trust retention of jurisdiction provision which sets forth the perpetual jurisdiction possessed by any court of equity over the enforcement of its judgments. Indeed, a court of equity has such jurisdiction even in the absence of any provision in its final judgment. United States v. Swift & Co., 286 U.S. 106, 114, 52 S. Ct. 460, 76 L.Ed. 999.

Alcoa challenges the jurisdiction of the Court and points out under the Government's interpretation of the powers reserved in Section X the present application could be made at any time since Section X has no time limitation. The defendant argues that such an interpretation carried to its logical conclusion renders all the provisions of Section VIII mere surplusage.

However, in resolving the question of jurisdiction we do not think it is necessary to rely on either the semantics of the terminology used in Section X or the

broad scope of retained jurisdiction in anti-trust cases under provisions similar to those in Section X. It suffices to state that in each case the retained jurisdiction of the Court is always defined by the terms of the judgment and the nature of the relief sought. United States v. United States Gypsum Co., 124 F.Supp. 573, 581, 582.

█ Here, Judge Knox' opinion and the resultant final judgment specifically provided for an application by the Government for further relief and set down a five-year time limit within which such an application was to be made. We do not agree with Alcoa's contentions that the only relief available to the Government under Section VIII is divestiture. The words "further and more complete relief" can fairly be considered as including an application for an extension of the time limit imposed.

The Government in its brief correctly points out that, despite the position assumed in its moving papers, its application does in fact meet all the preliminary pre-requisites of an application under Section VIII. The application was made within the five-year period and the claim is made that conditions warrant the relief sought. Jurisdiction is, therefore, assumed under the provisions of Section VIII for the purposes of determining whether or not the conditions relied on by the Government warrant the further relief requested. Rule 53(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

The issue is a narrow one and, in this Court's opinion, almost every relevant occurrence of the last five years militates against a determination that the Government is entitled to further relief in the form of an extension of the five year period.

### Judge Knox' Opinion

Judge Knox' Opinion, besides being a most learned and authoritative treatise on anti-trust remedial proceedings, is the law of this case. The completeness and clarity of his opinion greatly simplifies this Court's task.

Judge Knox, in denying the Government's application for divestiture, found that the Government disposal of its aluminum manufacturing facilities, pending which the Circuit Court had stayed remedial proceedings, had, in fact, resulted in the creation of two substantial and completely integrated aluminum manufacturers in vigorous competition with Alcoa.

He stated:

"The Reynolds and Kaiser organizations are operating successfully and profitably, and there is little or no reason to think that either of them will be unable, under existing trade circumstances, to continue to thrive, and even to prosper. The Government disposal program has launched them with excellent properties, low investments, and safeguards for their future stability." 91 F.Supp. 333, 418.

He also stated:

"The relative market positions for the period under review do not show prima facie monopoly power in Alcoa. But Alcoa's two major competitors—Reynolds and Kaiser—together have secured only 35% of a market in which Alcoa enjoys 50%. Nevertheless, Reynolds and Kaiser have consistently enlarged their shares." 91 F.Supp. 333, 364.

Alcoa in the proceeding before Judge Knox had affirmatively moved for a determination that competition existed in the aluminum industry. He refused to give Alcoa such a positive determination, in that he found that the evidence presented was insufficient to give him a well-founded assurance that, in future years, competitive conditions would be certain to prevail. 91 F.Supp. 333, 416.

As we read Judge Knox' opinion his only concern about the future competitive conditions of the aluminum industry was the continued success of Alcoa's two competitors, Reynolds and Kaiser. He saw

" * * * no likelihood of domestic competition arising in the aluminum industry, as now constituted, to chal-

lenge the present three producers." 91 F.Supp. 333, 401.

Judge Knox' immediate concern was the obvious opportunity for common control of Alcoa and Aluminium Limited of Canada, the largest aluminum producer in the world, to the detriment of Kaiser and Reynolds by virtue of a few persons' ownership of controlling interests in both companies. He expressed this fear as follows:

"The effective future competitive efforts of these two companies will be greatly enhanced if the shadow that now hangs over them in Alcoa's potential control of Aluminium Limited be removed.

"It is inevitable that investments are deterred, expansion retarded, and stability impaired by the power in Alcoa's controlling stockholders, if they choose to exercise it, to overwhelm, and put to naught, the best efforts of both Reynolds and Kaiser. Such power, whether or not exercised, and whether or not likely of execution, is omnipresent." 91 F.Supp. 333, 418.

He ordered these persons to dispose of either their Limited or Alcoa stock interests.

Judge Knox also expressed the hope that such a stock disposal would create another competitor in the domestic aluminum market, as follows:

"Moreover, if the common control of Alcoa and Limited be eliminated, it is fairly possible, and even probable, that there will be introduced into the domestic market, a rival that is fully worthy of Alcoa's steel. The competitive potential of Limited could not be duplicated in this country by the organization of an additional producer, except at the risk of serious danger and disruption to the present effectiveness of the industry. Today, the United States provides a natural and ample market for part of the huge surplus of metal produced in Canada. The activities of Limited can furnish a supplement to present competitive efforts in offering stimulants to efficiency and lowered prices, from which the general public will gain, and this, of course, is one purpose of the anti-trust laws." 91 F.Supp. 333, 418.

Having provided a remedy for this immediate threat to Kaiser's and Reynolds' future, Judge Knox proceeded to set forth the reasons for and purposes of his retention of jurisdiction for five years, as follows:

"These possibilities (that Limited's competition might impair the domestic competitive situation or Limited might not compete because of high tariffs), plus the fact that there has been such a short time over which the operation of Reynolds and Kaiser are open to appraisal, require that, for another five years, jurisdiction of this case shall be retained by the Court. Within that period, note can be taken of the progress—or otherwise—of Reynolds and Kaiser. If, for any reason, it should appear that their competition with Alcoa is feeble, uncertain and ineffective, appropriate action, in addition to that now about to be accorded the Government, will be in order." 91 F.Supp. 333, 418. (Parentheses added.)

Issue

As we have stated, the Government on this application seeks no additional relief other than a five-year extension of the period set down by Judge Knox. The Government does not claim that Kaiser's and Reynolds' competition with Alcoa is "feeble, uncertain and ineffective" but rather it takes the position that the developments of the five-year period have been such as not to remove the doubts Judge Knox expressed in 1950 and therefore this Court should extend its jurisdiction for another five years.

We have found such an application to be within the contemplation of Section VIII of the final judgment of 1950. However, contrary to the Govern-

ment's position, we are also of the opinion that under the law of this case the Government assumes the burden of showing either that the competitive future of Reynolds and Kaiser is, at least to some degree, more doubtful today than it was in 1950, or that, for some reason unforeseen in 1950, the five-year period has proven an inadequate test period. It is our opinion that the finality of the judgment of 1950, and the mere passage of the five-year period, fixed Alcoa's rights at least to that extent.

The Government, although disavowing any burden of proof, advances as one of its main arguments in support of its application, that the five years provided for in the 1950 Judgment were "atypical" years. The Government's other reasons are Alcoa's continued economic superiority, that the primary aluminum industry is still pre-empted and the relief by that stock disposal, provided for in the 1950 judgment, has proven ineffective.

We shall briefly examine the Government's position in conjunction with the stipulated facts above.

### Atypical Years

The Government points to the Korean conflict (Stipulated Fact 1); Government control (Stipulated Fact 2); a seller's market (Stipulated Fact 3); and governmental incentives to expansion in the aluminum industry (Stipulated Fact 4), all as unforeseen events in 1950 which so altered market conditions during the five-year period as to render those years of no value for the purpose Judge Knox intended.

The main purpose of retaining jurisdiction, we think, is clear. It was to see if Kaiser and Reynolds would thrive and prosper. We agree that the particular events, with the exception of Government controls, relied upon by the Government, were probably not foreseen in 1950 but we think the effect of such events was not only foreseeable but was actually foreseen. All the events relied upon, with the exception of Government controls,

had one ultimate effect on the aluminum industry—expansion.

Kaiser's and Reynolds' future in an expanding aluminum industry was exactly what Judge Knox was doubtful about in 1950, and he so expressed himself—

"In concluding this subject (Financial Resources), it is sufficient to say that the financial data before me show Reynolds and Kaiser to be capable of carrying on their operations with fair success under market conditions reasonably foreseeable. Nevertheless, Alcoa's financial strength is of a high order of superiority, and to the extent that the aluminum industry is considered an expanding one, the potentialities for Alcoa's growth outdistances any expectations which may be held for the other two companies." 91 F.Supp. 333, 386. (Parentheses added.)

The realities are that Kaiser and Reynolds more than maintain their competitive position in the phenomenal expansion of the industry. Stipulated Facts 5–22.

We have stated that the particular events relied on by the Government were not foreseeable but certainly events of their general nature were and would necessarily be considered as possible at the present time during any future five-year period. A court would be naive, indeed, not to foresee as possible, Government controls, Government incentives, war (cold or hot), and a seller's market within the next five years.

All of the events relied upon by the Government operated with equal effect on Alcoa as well as on Kaiser and Reynolds. In view of Kaiser's and Reynolds' progress and development, it is our opinion that, only if the Government could show that the conditions of the last five years were such as to have created a form of "economic hothouse" within which Reynolds and Kaiser alone thrived, could the Court at this stage of

these proceedings be justified in discounting the results of the five-year period provided for in the final judgment. None of the events relied on by the Government, or any combination of them, came even close to effecting such a result.

### Alcoa's Superior Competitive Position

It is the Government's position that its application should be granted because Alcoa still maintains its superior competitive position. Here, again, we feel the Government relies on a fact that has no significance of and in itself. Once the fact is put within its proper frame of reference for the purposes of this application—Judge Knox' opinion—it completely fails to support the Government's position.

The purpose of the five-year period was to observe Kaiser's and Reynolds' progress or lack of it. Alcoa's competitive position is significant only insofar as it may have increased at the expense of Reynolds and Kaiser. The facts are that Alcoa's relative share of the aluminum market has declined; Kaiser's has increased substantially; and Reynolds' has remained about the same.

The following excerpts from the Stipulated Tables (See Appendix 153 F.Supp. 172) speak for themselves:

Market Position—Production and Purchases of Primary
and Secondary Aluminum in the United States

| | Alcoa | | Reynolds | | Kaiser | | Total for Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1949** | | | | | | | | |
| Production ............ | 582,783 | 48.3 | 364,955 | 30.2 | 259,984 | 21.5 | 1,207,722 | 100.0 |
| Purchased Primary (1) .. | 112,137 | 87.9 | 9,875 | 7.7 | 5,542 | 4.4 | 127,554 | 100.0 |
| Purchased Secondary (2) . | 18,854 | 63.6 | 8,061 | 27.2 | 2,713 | 9.2 | 29,628 | 100.0 |
| Total ......... | 713,774 | 52.3 | 382,891 | 28.0 | 268,239 | 19.7 | 1,364,904 | 100.0 |
| **1956 (First Nine Months)** | | | | | | | | |
| Production ............ | 1,110,953 | 46.6 | 620,555 | 26.1 | 649,853 | 27.3 | 2,381,361 | 100.0 |
| Purchased Primary (1) .. | 130,467 | 66.7 | 16,418 | 8.4 | 48,654 | 24.9 | 195,539 | 100.0 |
| Purchased Secondary (2) . | 4,729 | 44.5 | 3,997 | 37.6 | 1,901 | 17.9 | 10,627 | 100.0 |
| Total ......... | 1,246,149 | 48.2 | 640,970 | 24.7 | 700,408 | 27.1 | 2,587,527 | 100.0 |

Market Position—Sales (All Stages of Production)

| | Alcoa | | Reynolds | | Kaiser | | Total for Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1949** | | | | | | | | |
| Pig and Ingot (3) ......... | 132,279 | 68.2 | 45,367 | 23.4 | 16,344 | 8.4 | 193,990 | 100.0 |
| Sheet ................. | 241,941 | 38.3 | 205,258 | 32.5 | 184,574 | 29.2 | 631,773 | 100.0 |
| Other Fabrications ...... | 314,136 | 74.3 | 98,615 | 23.3 | 9,888 | 2.4 | 422,639 | 100.0 |
| Total .......... | 688,356 | 55.1 | 349,240 | 28.0 | 210,806 | 16.9 | 1,248,402 | 100.0 |
| **1956 (First Nine Months)** | | | | | | | | |
| Pig and Ingot (3) ........ | 288,697 | 39.2 | 191,523 | 26.0 | 256,477 | 34.8 | 736,697 | 100.0 |
| Sheet ................. | 393,670 | 41.8 | 272,470 | 29.0 | 275,092 | 29.2 | 941,232 | 100.0 |
| Other Fabrications ...... | 412,375 | 58.2 | 173,836 | 24.5 | 122,767 | 17.3 | 708,978 | 100.0 |
| Total .......... | 1,094,742 | 45.9 | 637,829 | 26.7 | 654,336 | 27.4 | 2,386,907 | 100.0 |

## Net Worth

| | Alcoa | | Reynolds | | Kaiser | | Total for Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| December 31, 1949 | 306,407 | 76.7 | 55,103 | 13.8 | 37,725 | 9.5 | 399,235 | 100 |
| September 30, 1956 | 605,079 | 57.2 | 220,370 | 20.9 | 231,522 | 21.9 | 1,056,971 | 100 |

Earnings

| | 1949—First 9 Mos. | | 1955—First 9 Mos. | | 1956—First 9 Mos. | |
|---|---|---|---|---|---|---|
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| Earnings before Taxes | | | | | | |
| Alcoa | 38,826 | 70:8 | **136,959 | 57.0 | 138,457 | 52.1 |
| Reynolds | 5,969 | 10.9 | 51,950 | 21.6 | 63,092 | 23.7 |
| Kaiser | 10,009 | 18:3 | 51,552 | 21.4 | 64,486 | 24.2 |
| Earnings after Taxes | | | | | | |
| Alcoa | 22,744 | 69.9 | ** 68,280 | 56.6 | 67,160 | 50.7 |
| Reynolds | 3,371 | 10.4 | 25,904 | 21.5 | 31,456 | 23.8 |
| Kaiser | 6,421 | 19.7 | 26,346 | 21.9 | 33,701 | 25.5 |
| Earnings after Taxes and Cash Dividends | | | | | | |
| Alcoa | 13,552 | 71.0 | ** 51,170 | 54.4 | 46,829 | 48.9 |
| Reynolds | 2,237 | 11.7 | 23,643 | 25.1 | 26,305 | 27.4 |
| Kaiser | 3,301 | 17.3 | 19,232 | 20.5 | 22,701 | 23.7 |

**See Appendix, Table 9 note.

The inescapable conclusion from the facts reflected in these Tables and in those contained in the Stipulated Facts 5 to 16 is that Kaiser and Reynolds have not only thrived and prospered but they have removed all reasonable doubts as to their capacity to effectively compete with Alcoa in the future.

### Preemption of Primary Aluminum Industry Failure of Stock Disposal Remedy

The Government argues that the primary aluminum industry remains closed to prospective producers unless they are the beneficiaries of Government assistance.

It is difficult to perceive how this contention in and of itself can in any way aid the Government's position within the boundaries of Judge Knox' opinion. We have already noted that a basic premise of the remedial relief afforded was that the existing producers of primary aluminum had preempted the field and in all probability no other domestic producers of primary aluminum would come into being. Time has proven that premise to have been erroneous. Other producers have entered, or are about to enter, the field. Stipulated Facts 5; 6 and 7. That the Government itself, through supply contracts and rapid tax amortization privileges, has been the cause to some degree may be laudatory but we think immaterial to the issue raised by this application.

The material fact is that there is no indication that the existence or contemplated existence of these new producers has in any way lessened the competitive status of the primary aluminum market or benefited Alcoa. At the present time there is no reason to believe these new producers will not increase competition in the primary aluminum market at Alcoa's expense as much as Reynolds' or Kaiser's.

In this same vein the Government also argues that the stock disposal ordered in the final judgment has not been effective in that Aluminium Limited has not become a competitor of Alcoa.

The main purpose of the stock disposal was clearly expressed to be the elimination of the possibility of or the effects of even the fear of the possibility that Alcoa and Limited would "gang up" on Kaiser and Reynolds. There is not a scintilla of evidence before this Court that Alcoa

and Limited have acted in unison to the detriment of Reynolds or Kaiser. On the basis of the facts before us it must be presumed that the stock disposal remedy completely achieved its main purpose.

While it is true that Judge Knox expressed the hope that by virtue of the stock disposal plan Limited would become a more active competitor with Alcoa in the domestic market, it is clear that this purpose was secondary and of necessity based on the belief that Limited was the only possible new competitor. In addition, the facts show that Limited has increased its competition with Alcoa in the domestic market since 1950. In the last nine months of 1949 Alcoa received 78.3% of the primary aluminum sold by Limited in the domestic market. In the last nine months of 1956 Aloca received 36.2% of the total primary aluminum sold by Limited in United States. The total quantity of primary aluminum sold in the domestic market by Limited increased from 90,774 pounds in the first nine months of 1949 to 348,465 for the same period in 1956. Stipulated Table X.

Nor has Limited's increased competition in the domestic market during the five-year period in any way reduced Reynolds' and Kaiser's market position, which possibly was one of the reasons for retaining jurisdiction. Nor did any domestic producer effect an increase of tariff and so keep Limited out of the domestic market, which was another reason for retaining jurisdiction. The fact is that the tariff on primary aluminum was lowered.

### Conclusion

■ As we have stated, Judge Knox' opinion, and the resultant final judgment of 1950, is the law of this case. The facts here do not sustain this application for they fail to reveal any basis for retaining jurisdiction within the framework of that opinion.

Motion denied.

### Appendix

Table III   —Supplying the Non-Integrated Fabricators Sales of Primary Aluminum of the Domestic Integrated Producers (1).

Table IV   —Market Position—Production and Purchases of Primary and Secondary Aluminum in the United States.

Table V   —Market Position—Sales (All Stages of Production).

Table VI   —Income of Metal (Integrated Producers).

Table VII —Mill Costs (Cents per Pound of Pig).

Table VIII—Net Worth.

Table IX   —Earnings.

Table X   —Aluminum Import Corporation (now known as Aluminium Limited Sales, Inc.) Sales of Primary Aluminum in the United States.

Further Extended

Table III

Supplying the Non-Integrated Fabricators
Sales of Primary Aluminum of the Domestic
Integrated Producers (1)

| | Alcoa | | | | Reynolds | | | | Kaiser | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Dollars | % | Thousands of Pounds | % | Thousands of Dollars | % | Thousands of Pounds | % | Thousands of Dollars | % | Thousands of Pounds | % | Thousands of Dollars | % |
| 1947..... | 171,934 | 88 | 25,519 | 90 | 16,754 | 9 | 2,009 | 7 | 5,823 | 3 | 815 | 3 | 194,511 | 100 | 28,343 | 100 |
| 1948..... | 185,650 | 85 | 28,899 | 86 | 22,268 | 10 | 3,030 | 9 | 11,009 | 5 | 1,618 | 5 | 218,927 | 100 | 33,547 | 100 |
| 1949..... | 132,194 | 80 | 23,674 | 83 | 22,168 | 13 | 3,109 | 11 | 10,882 | 7 | 1,822 | 6 | 165,244 | 100 | 28,605 | 100 |
| 1950..... | 167,497 | 64 | 30,690 | 65 | 59,241 | 22 | 9,794 | 21 | 36,581 | 14 | 6,689 | 14 | 263,319 | 100 | 47,173 | 100 |
| 1951..... | 119,209 | 49 | 23,926 | 49 | 73,043 | 30 | 14,273 | 30 | 50,397 | 21 | 10,070 | 21 | 242,649 | 100 | 48,269 | 100 |
| 1952..... | 126,690 | 38 | 25,856 | 38 | 113,748 | 35 | 21,377 | 33 | 89,432 | 27 | 18,248 | 28 | 329,870 | 100 | 65,481 | 100 |
| 1953..... | 119,925 | 31 | 26,849 | 32 | 142,728 | 37 | 28,591 | 35 | 126,320 | 32 | 27,324 | 33 | 388,973 | 100 | 82,764 | 100 |
| 1954..... | 115,082 | 30 | 27,227 | 32 | 135,710 | 35 | 27,969 | 33 | 135,975 | 35 | 30,128 | 35 | 386,767 | 100 | 85,324 | 100 |
| 1955..... | 294,723 | 39 | 71,531 | 40 | 196,278 | 26 | 43,254 | 25 | 260,741(2) | 35 | 62,609 | 35 | 751,742 | 100 | 177,394 | 100 |
| 1949 (First 9 Months) | 92,926 | 82 | 16,205 | 84 | 16,799 | 15 | 2,400 | 13 | 4,046 | 3 | 663 | 3 | 113,771 | 100 | 19,268 | 100 |
| 1955 (First 9 Months) | 212,894 | 39 | 51,359 | 40 | 145,848 | 27 | 31,797 | 25 | 188,607 | 34 | 44,654 | 35 | 547,349 | 100 | 127,810 | 100 |
| 1956 (First 9 Months) | 287,546 | 41 | 74,255 | 42 | 167,298 | 24 | 39,919 | 22 | 249,362 | 35 | 63,482 | 36 | 704,206 | 100 | 177,656 | 100 |

(1) The above figures exclude sales for export, sales to the U. S. Government Stockpile and sales among the companies listed.
(2) Excludes sales to Anaconda Aluminum Company of 1,984 pounds.

Further Extended

Table IV

Market Position—Production and Purchases of Primary and
Secondary Aluminum in the United States

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | | Imports of Primary and Secondary (3) | | Secondary (4) | | Total Aluminum Supply | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1947** | | | | | | | | | | | | | | |
| Production ............ | 637,951 | 55.8 | 320,480 | 28.0 | 184,979 | 16.2 | 1,143,410 | 100.0 | | | | | | |
| Purchased Primary (1) . | 114,468 | 85.7 | 5,152 | 3.9 | 13,949 | 10.4 | 133,569 | 100.0 | | | | | | |
| Purchased Secondary (2) | 91,431 | 79.3 | 19,581 | 17.0 | 4,265 | 3.7 | 115,277 | 100.0 | | | | | | |
| Total ............ | 843,850 | 60.6 | 345,213 | 24.8 | 203,193 | 14.6 | 1,392,256 | 100.0 | 35,137 | 2.2 | 223,065 | 13.5 | 1,650,458 | 100.0 |
| | | 51.1 | | 20.9 | | 12.3 | | | | | | | | |
| **1948** | | | | | | | | | | | | | | |
| Production ............ | 652,309 | 52.3 | 338,313 | 27.1 | 256,289 | 20.6 | 1,246,911 | 100.0 | | | | | | |
| Purchased Primary (1) . | 146,806 | 77.7 | 28,837 | 15.3 | 13,154 | 7.0 | 188,797 | 100.0 | | | | | | |
| Purchased Secondary (2) | 37,915 | 56.3 | 25,883 | 38.5 | 3,487 | 5.2 | 67,285 | 100.0 | | | | | | |
| Total ............ | 837,030 | 55.7 | 393,033 | 26.1 | 272,930 | 18.2 | 1,502,993 | 100.0 | 160,018 | 8.9 | 125,016 | 7.0 | 1,788,027 | 100.0 |
| | | 46.8 | | 22.0 | | 15.3 | | | | | | | | |
| **1949** | | | | | | | | | | | | | | |
| Production ............ | 582,783 | 48.3 | 364,955 | 30.2 | 259,984 | 21.5 | 1,207,722 | 100.0 | | | | | | |
| Purchased Primary (1) | 112,137 | 87.9 | 9,875 | 7.7 | 5,542 | 4.4 | 127,554 | 100.0 | | | | | | |
| Purchased Secondary (2) | 18,854 | 63.6 | 8,061 | 27.2 | 2,713 | 9.2 | 29,628 | 100.0 | | | | | | |
| Total ............ | 713,774 | 52.3 | 382,891 | 28.0 | 268,239 | 19.7 | 1,364,904 | 100.0 | 115,196 | 7.5 | 62,301 | 4.0 | 1,542,401 | 100.0 |
| | | 46.3 | | 24.8 | | 17.4 | | | | | | | | |
| **1950** | | | | | | | | | | | | | | |
| Production ............ | 707,954 | 49.2 | 433,504 | 30.1 | 296,570 | 20.7 | 1,438,028 | 100.0 | | | | | | |
| Purchased Primary (1) . | 250,098 | 86.2 | 25,170 | 8.7 | 14,953 | 5.1 | 290,221 | 100.0 | | | | | | |
| Purchased Secondary (2) | 13,808 | 53.2 | 6,318 | 24.4 | 5,811 | 22.4 | 25,937 | 100.0 | | | | | | |
| Total ............ | 971,860 | 55.4 | 464,992 | 26.5 | 317,334 | 18.1 | 1,754,186 | 100.0 | 205,022 | 9.8 | 129,346 | 6.2 | 2,088,554 | 100.0 |
| | | 46.5 | | 22.3 | | 15.2 | | | | | | | | |

Further Extended

Table IV (Continued)

Market Position—Production and Purchases of Primary and Secondary Aluminum in the United States

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | | Imports of Primary and Secondary (3) | | Secondary (4) | | Total Aluminum Supply | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1951** | | | | | | | | | | | | | | |
| Production ........... | 851,080 | 50.8 | 487,013 | 29.1 | 336,570 | 20.1 | 1,674,663 | 100.0 | | | | | | |
| Purchased Primary (1). | 71,981 | 66.7 | 16,906 | 15.6 | 19,084 | 17.7 | 107,971 | 100.0 | | | | | | |
| Purchased Secondary (2) | 7,851 | 49.7 | 3,481 | 22.0 | 4,469 | 28.3 | 15,801 | 100.0 | | | | | | |
| Total ............. | 930,912 | 51.8 | 507,400 | 28.2 | 360,123 | 20.0 | 1,798,435 | 100.0 | 179,107 | 8.5 | 139,909 | 6.6 | 2,117,451 | 100.0 |
| | | 43.9 | | 24.0 | | 17.0 | | | | | | | | |
| **1952** | | | | | | | | | | | | | | |
| Production ........... | 935,136 | 49.9 | 553,218 | 29.5 | 386,310 | 20.6 | 1,874,664 | 100.0 | | | | | | |
| Purchased Primary (1) . | 58,501 | 40.2 | 48,319 | 33.2 | 38,836 | 26.6 | 145,656 | 100.0 | | | | | | |
| Purchased Secondary (2) | 12,162 | 53.6 | 4,743 | 20.9 | 5,773 | 25.5 | 22,678 | 100.0 | | | | | | |
| Total ............. | 1,005,799 | 49.2 | 606,280 | 29.7 | 430,919 | 21.1 | 2,042,998 | 100.0 | 190,440 | 8.1 | 120,270 | 5.1 | 2,353,708 | 100.0 |
| | | 42.7 | | 25.8 | | 18.3 | | | | | | | | |
| **1953** | | | | | | | | | | | | | | |
| Production ........... | 1,222,614 | 48.8 | 665,051 | 26.6 | 616,240 | 24.6 | 2,503,905 | 100.0 | | | | | | |
| Purchased Primary (1) . | 143,400 | 52.6 | 63,865 | 23.5 | 65,217 | 23.9 | 272,482 | 100.0 | | | | | | |
| Purchased Secondary (2) | 17,946 | 53.7 | 8,364 | 25.0 | 7,136 | 21.3 | 33,446 | 100.0 | | | | | | |
| Total ............. | 1,383,960 | 49.3 | 737,280 | 26.2 | 688,593 | 24.5 | 2,809,833 | 100.0 | 427,405 | 12.7 | 127,941 | 3.8 | 3,365,179 | 100.0 |
| | | 41.1 | | 21.9 | | 20.5 | | | | | | | | |
| **1954** | | | | | | | | | | | | | | |
| Production ........... | 1,331,874 | 45.6 | 802,460 | 27.5 | 786,730 | 26.9 | 2,921,064 | 100.0 | | | | | | |
| Purchased Primary (1) . | 126,802 | 73.1 | 9,523 | 5.5 | 37,208 | 21.4 | 173,533 | 100.0 | | | | | | |
| Purchased Secondary (2) | 11,494 | 56.2 | 4,651 | 22.7 | 4,305 | 21.1 | 20,450 | 100.0 | | | | | | |
| Total ............. | 1,470,170 | 47.2 | 816,634 | 26.2 | 828,243 | 26.6 | 3,115,047 | 100.0 | 299,073 | 8.5 | 102,752 | 2.9 | 3,516,872 | 100.0 |
| | | 41.8 | | 23.2 | | 23.6 | | | | | | | | |

Further Extended

Table IV (Continued)

Market Position—Production and Purchases of Primary and Secondary Aluminum in the United States

| | Alcoa (Thousands of Pounds) | % | Reynolds (Thousands of Pounds) | % | Kaiser (Thousands of Pounds) | % | Total For Three Companies (Thousands of Pounds) | % | Imports of Primary and Secondary (3) (Thousands of Pounds) | % | Secondary (4) (Thousands of Pounds) | % | Total Aluminum Supply (Thousands of Pounds) | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1955** | | | | | | | | | | | | | | |
| Production | 1,404,461 | 45.3 | 857,737 | 27.6 | 839,591 | 27.1 | 3,101,789 | 100.0 | | | | | | |
| Purchased Primary (1) | 134,031 | 73.7 | 16,273 | 8.9 | 31,687 | 17.4 | 181,991 | 100.0 | | | | | | |
| Purchased Secondary (2) | 5,794 | 33.2 | 10,235 | 58.5 | 1,454 | 8.3 | 17,483 | 100.0 | | | | | | |
| Total | 1,544,286 | 46.8 / 41.3 | 884,245 | 26.8 / 23.6 | 872,732 | 26.4 / 23.4 | 3,301,263 | 100.0 | 282,317 | 7.6 | 151,414 | 4.1 | 3,734,994 | 100.0 |
| **1949 (First Nine Months)** | | | | | | | | | | | | | | |
| Production | 492,196 | 51.2 | 272,897 | 28.4 | 196,681 | 20.4 | 961,774 | 100.0 | | | | | | |
| Purchased Primary (1) | 76,223 | 89.0 | 4,924 | 5.8 | 4,490 | 5.2 | 85,637 | 100.0 | | | | | | |
| Purchased Secondary (2) | 23,103 | 61.2 | 11,565 | 30.6 | 3,096 | 8.2 | 37,764 | 100.0 | | | | | | |
| Total | 591,522 | 54.5 / 47.1 | 289,386 | 26.7 / 23.0 | 204,267 | 18.8 / 16.3 | 1,085,175 | 100.0 | 77,354 | 6.1 | 93,762 | 7.5 | 1,256,291 | 100.0 |
| **1955 (First Nine Months)** | | | | | | | | | | | | | | |
| Production | 1,045,732 | 45.3 | 633,670 | 27.4 | 629,230 | 27.3 | 2,308,632 | 100.0 | | | | | | |
| Purchased Primary (1) | 117,430 | 80.8 | 9,638 | 6.6 | 18,264 | 12.6 | 145,332 | 100.0 | | | | | | |
| Purchased Secondary (2) | 3,455 | 28.7 | 7,361 | 61.1 | 1,227 | 10.2 | 12,043 | 100.0 | | | | | | |
| Total | 1,166,617 | 47.3 / 41.8 | 650,669 | 26.4 / 23.3 | 648,721 | 26.3 / 23.3 | 2,466,007 | 100.0 | 212,634 | 7.6 | 110,795 | 4.0 | 2,789,436 | 100.06 |
| **1956 (First Nine Months)** | | | | | | | | | | | | | | |
| Production | 1,110,953 | 46.6 | 620,555 | 26.1 | 649,853 | 27.3 | 2,381,361 | 100.0 | | | | | | |
| Purchased Primary (1) | 130,467 | 66.7 | 16,418 | 8.4 | 48,654 | 24.9 | 195,539 | 100.0 | | | | | | |
| Purchased Secondary (2) | 4,729 | 44.5 | 3,997 | 37.6 | 1,901 | 17.9 | 10,627 | 100.0 | | | | | | |
| Total | 1,246,149 | 48.2 / 43.3 | 640,970 | 24.7 / 22.3 | 700,408 | 27.1 / 24.4 | 2,587,527 | 100.0 | 180,862 | 6.3 | 106,445 | 3.7 | 2,874,834 | 100.0 |

(1) These figures are exclusive of the intercompany sales among Alcoa, Reynolds and Kaiser.

(2) The secondary or scrap here referred to relates only to old scrap as explained in the text of the opinion of the court reported in 91 F.Supp. 333, at pages 357–59. The figures have been estimated in part by applying the proportion which reclaimed metal from old scrap bears to total market scrap to the purchases of domestic scrap. For 1947, 1948 and the first nine months of 1949 the figures for Alcoa include scrap and secondary ingot imported from Canada, whether this is old or new scrap. Reynolds and Kaiser did not purchase any secondary from Canada during that period. For the complete year 1949 and later periods, the figures for Alcoa and Kaiser include scrap and secondary ingot imported from all countries, whether this old or new scrap. Reynolds did not import any scrap or secondary during this period.

(3) These figures consist of imported primary, secondary and scrap not purchased by the three listed companies.

(4) If Alcoa, Reynolds or Kaiser purchased any imported secondary from a source other than Canada during 1947, 1948 and the first nine months of 1949, it is accounted for in these figures, which are computed by deducting from the total production in the United States of secondary from old scrap the estimated amount of secondary attributable to old scrap which the three producers purchased from all sources. However, for Alcoa, since the Canadian purchases during this period were deducted under imports, they are not again deducted here. These calculations were necessary for this period because outside of the purchases of secondary from Canada of the three companies, purchases of imported secondary by these companies from other countries do not appear in evidence. With respect to the full calendar year 1949 and subsequent periods, information furnished by the three companies showed total imports of secondary ingot and scrap whether from Canada or other countries. Such information showed that during this period Reynolds did not import any scrap or secondary ingot. For Alcoa and Kaiser during this period, since all importations of scrap and secondary ingot were deducted under imports, they are not again deducted here. For this period, therefore, these figures do not include any imported scrap or secondary ingot by Alcoa, Reynolds or Kaiser.

Further Extended

Table V

Market Position—Sales (All Stages of Production)

| | Alcoa (Thousands of Pounds) | % | Reynolds (Thousands of Pounds) | % | Kaiser (Thousands of Pounds) | % | Total For Three Companies (Thousands of Pounds) | % | Imports (1) (Thousands of Pounds) | % | Secondary (2) (Thousands of Pounds) | % | Total Market (Thousands of Pounds) | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1947** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 172,090 | 76.8 | 23,351 | 10.4 | 28,762 | 12.8 | 224,203 | 100.0 | | | | | | |
| Sheet | 459,589 | 48.2 | 308,408 | 32.3 | 185,471 | 19.5 | 953,468 | 100.0 | | | | | | |
| Other Fabrications | 297,863 | 83.0 | 60,900 | 17.0 | — | — | 358,763 | 100.0 | | | | | | |
| Total | 929,542 | 60.5 | 392,659 | 25.6 | 214,233 | 13.9 | 1,536,434 | 100.0 | 42,923 | 2.4 | 223,065 | 12.4 | 1,802,422 | 100.0 |
| | | 51.5 | | 21.8 | | 11.9 | | | | | | | | |
| **1948** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 185,678 | 84.7 | 22,288 | 10.2 | 11,009 | 5.1 | 218,975 | 100.0 | | | | | | |
| Sheet | 491,010 | 45.8 | 319,082 | 29.7 | 262,966 | 24.5 | 1,073,058 | 100.0 | | | | | | |
| Other Fabrications | 354,264 | 79.7 | 85,284 | 20.1 | 786 | .2 | 440,334 | 100.0 | | | | | | |
| Total | 1,030,952 | 59.5 | 426,654 | 24.6 | 274,851 | 15.9 | 1,732,367 | 100.0 | 186,976 | 9.2 | 125,016 | 6.1 | 2,044,359 | 100.0 |
| | | 50.4 | | 20.9 | | 13.4 | | | | | | | | |
| **1949** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 132,279 | 68.2 | 45,367 | 23.4 | 16,344 | 8.4 | 193,990 | 100.0 | | | | | | |
| Sheet | 241,941 | 38.3 | 205,258 | 32.5 | 184,574 | 29.2 | 631,773 | 100.0 | | | | | | |
| Other Fabrications | 314,136 | 74.3 | 98,615 | 23.3 | 9,888 | 2.4 | 422,639 | 100.0 | | | | | | |
| Total | 688,356 | 55.1 | 349,240 | 28.0 | 210,806 | 16.9 | 1,248,402 | 100.0 | 131,516 | 9.1 | 62,301 | 4.3 | 1,442,219 | 100.0 |
| | | 47.8 | | 24.2 | | 14.6 | | | | | | | | |
| **1950** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 168,059 | 54.2 | 91,210 | 29.4 | 50,951 | 16.4 | 310,220 | 100.0 | | | | | | |
| Sheet | 410,215 | 46.1 | 233,863 | 26.3 | 245,403 | 27.6 | 889,481 | 100.0 | | | | | | |
| Other Fabrications | 447,905 | 71.8 | 138,327 | 22.2 | 37,486 | 6.0 | 623,718 | 100.0 | | | | | | |
| Total | 1,026,179 | 56.3 | 463,400 | 25.4 | 333,840 | 18.3 | 1,823,419 | 100.0 | 227,912 | 10.5 | 129,346 | 5.9 | 2,180,677 | 100.0 |
| | | 47.1 | | 21.2 | | 15.3 | | | | | | | | |

Further Extended
## Table V (Continued)
### Market Position—Sales (All Stages of Production)

| | Alcoa (Thousands of Pounds) | % | Reynolds (Thousands of Pounds) | % | Kaiser (Thousands of Pounds) | % | Total For Three Companies (Thousands of Pounds) | % | Imports (1) (Thousands of Pounds) | % | Secondary (2) (Thousands of Pounds) | % | Total Market (Thousands of Pounds) | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1951** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 130,886 | 46.4 | 79,196 | 28.1 | 72,149 | 25.5 | 282,231 | 100.0 | | | | | | |
| Sheet | 310,829 | 39.1 | 253,326 | 31.9 | 230,960 | 29.0 | 795,115 | 100.0 | | | | | | |
| Other Fabrications | 449,275 | 66.2 | 164,776 | 24.3 | 64,372 | 9.5 | 678,423 | 100.0 | | | | | | |
| Total | 890,990 | 50.7 / 42.1 | 497,298 | 28.3 / 23.5 | 367,481 | 21.0 / 17.4 | 1,755,769 | 100.0 | 220,785 | 10.4 | 139,909 | 6.6 | 2,116,463 | 100.0 |
| **1952** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 132,619 | 35.0 | 133,474 | 35.3 | 112,358 | 29.7 | 378,451 | 100.0 | | | | | | |
| Sheet | 315,928 | 38.3 | 265,306 | 32.2 | 242,681 | 29.5 | 823,915 | 100.0 | | | | | | |
| Other Fabrications | 540,554 | 66.2 | 184,265 | 22.6 | 91,626 | 11.2 | 816,445 | 100.0 | | | | | | |
| Total | 989,101 | 49.0 / 41.8 | 583,045 | 28.9 / 24.6 | 446,665 | 22.1 / 18.9 | 2,018,811 | 100.0 | 226,598 | 9.6 | 120,270 | 5.1 | 2,365,679 | 100.0 |
| **1953** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 122,805 | 27.1 | 171,203 | 37.8 | 158,655 | 35.1 | 452,663 | 100.0 | | | | | | |
| Sheet | 442,220 | 42.1 | 298,866 | 28.4 | 310,130 | 29.5 | 1,051,216 | 100.0 | | | | | | |
| Other Fabrications | 572,473 | 65.7 | 191,078 | 21.9 | 107,768 | 12.4 | 871,319 | 100.0 | | | | | | |
| Total | 1,137,498 | 47.9 / 37.9 | 661,147 | 27.8 / 22.0 | 576,553 | 24.3 / 19.2 | 2,375,198 | 100.0 | 497,661 | 16.6 | 127,941 | 4.3 | 3,000,800 | 100.0 |
| **1954** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 115,685 | 27.7 | 158,295 | 38.0 | 143,132 | 34.3 | 417,112 | 100.0 | | | | | | |
| Sheet | 367,523 | 43.3 | 247,256 | 29.2 | 233,065 | 27.5 | 847,844 | 100.0 | | | | | | |
| Other Fabrications | 490,689 | 65.4 | 171,472 | 22.9 | 87,673 | 11.7 | 749,834 | 100.0 | | | | | | |
| Total | 973,897 | 48.4 / 39.8 | 577,023 | 28.6 / 23.6 | 463,870 | 23.0 / 18.9 | 2,014,790 | 100.0 | 331,672 | 13.5 | 102,752 | 4.2 | 2,449,214 | 100.0 |

Further Extended

Table V (Continued)

Market Position—Sales (All Stages of Production)

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | | Imports (1) | | Secondary (2) | | Total Market | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1955** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 295,127 | 37.4 | 228,400 | 28.9 | 266,613 | 33.7 | 790,140 | 100.0 | | | | | | |
| Sheet | 560,715 | 45.6 | 327,092 | 26.6 | 342,336 | 27.8 | 1,230,143 | 100.0 | | | | | | |
| Other Fabrications | 602,400 | 60.9 | 234,752 | 23.8 | 151,448 | 15.3 | 988,600 | 100.0 | | | | | | |
| Total | 1,458,242 | 48.4 | 790,244 | 26.3 | 760,397 | 25.3 | 3,008,883 | 100.0 | 333,266 | 9.6 | 151,414 | 4.3 | 3,493,563 | 100.0 |
| | | 41.7 | | 22.6 | | 21.8 | | | | | | | | |
| **1949 (First Nine Months)** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 92,983 | 72.5 | 28,899 | 22.6 | 6,289 | 4.9 | 128,171 | 100.0 | | | | | | |
| Sheet | 201,817 | 40.6 | 166,921 | 33.6 | 127,863 | 25.8 | 496,601 | 100.0 | | | | | | |
| Other Fabrications | 250,233 | 76.0 | 75,456 | 22.9 | 3,440 | 1.1 | 329,129 | 100.0 | | | | | | |
| Total | 545,033 | 57.1 | 271,276 | 28.5 | 137,592 | 14.4 | 953,901 | 100.0 | 93,354 | 8.2 | 93,762 | 8.2 | 1,141,017 | 100.0 |
| | | 47.8 | | 23.8 | | 12.0 | | | | | | | | |
| **1955 (First Nine Months)** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 213,268 | 37.0 | 170,192 | 29.5 | 193,115 | 33.5 | 576,575 | 100.0 | | | | | | |
| Sheet | 419,462 | 45.8 | 242,505 | 26.5 | 253,348 | 27.7 | 915,315 | 100.0 | | | | | | |
| Other Fabrications | 466,127 | 62.1 | 174,088 | 23.2 | 110,506 | 14.7 | 750,721 | 100.0 | | | | | | |
| Total | 1,098,857 | 49.0 | 586,785 | 26.2 | 556,969 | 24.8 | 2,242,611 | 100.0 | 245,364 | 9.4 | 110,795 | 4.3 | 2,598,770 | 100.0 |
| | | 42.3 | | 22.6 | | 21.4 | | | | | | | | |
| **1956 (First Nine Months)** | | | | | | | | | | | | | | |
| Pig and Ingot (3) | 288,697 | 39.2 | 191,523 | 26.0 | 256,477 | 34.8 | 736,697 | 100.0 | | | | | | |
| Sheet | 393,670 | 41.8 | 272,470 | 29.0 | 275,092 | 29.2 | 941,232 | 100.0 | | | | | | |
| Other Fabrications | 412,375 | 58.2 | 173,836 | 24.5 | 122,767 | 17.3 | 708,978 | 100.0 | | | | | | |
| Total | 1,094,742 | 45.9 | 637,829 | 26.7 | 654,336 | 27.4 | 2,386,907 | 100.0 | 222,800 | 8.2 | 106,445 | 3.9 | 2,716,152 | 100.0 |
| | | 40.3 | | 23.5 | | 24.1 | | | | | | | | |

(1) Includes all aluminum products imported whether primary, secondary or fabrications, except primary and secondary imported by the three companies listed.

(2) These are the same figures which appear in Table IV.

(3) These figures exclude sales to the U. S. Government stockpile, if any.

Further Extended

Table VI

Income of Metal (Integrated Producers)

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1947** | | | | | | | | |
| Production | 637,951 | 55.8 | 320,480 | 28.0 | 184,979 | 16.2 | 1,143,410 | 100.0 |
| Purchased Primary | 114,468 | 85.7 | 5,152 | 3.9 | 13,949 | 10.4 | 133,569 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 91,431 | 79.3 | 19,581 | 17.0 | 4,265 | 3.7 | 115,277 | 100.0 |
| Purchased secondary from new scrap | 99,439 | 86.9 | 10,300 | 9.0 | 4,733 | 4.1 | 114,472 | 100.0 |
| Total | 943,289 | 62.6 | 355,513 | 23.6 | 207,926 | 13.8 | 1,506,728 | 100.0 |
| **1948** | | | | | | | | |
| Production | 652,309 | 52.3 | 338,313 | 27.1 | 256,289 | 20.6 | 1,246,911 | 100.0 |
| Purchased Primary | 146,806 | 77.7 | 28,837 | 15.3 | 13,154 | 7.0 | 188,797 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 37,915 | 56.3 | 25,883 | 38.5 | 3,487 | 5.2 | 67,285 | 100.0 |
| Purchased secondary from new scrap | 61,511 | 54.9 | 44,451 | 39.7 | 5,988 | 5.4 | 111,950 | 100.0 |
| Total | 898,541 | 55.6 | 437,484 | 27.1 | 278,918 | 17.3 | 1,614,943 | 100.0 |
| **1949** | | | | | | | | |
| Production | 582,783 | 48.3 | 364,955 | 30.2 | 259,984 | 21.5 | 1,207,722 | 100.0 |
| Purchased Primary | 112,137 | 87.9 | 9,875 | 7.7 | 5,542 | 4.4 | 127,554 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 18,854 | 63.6 | 8,061 | 27.2 | 2,713 | 9.2 | 29,628 | 100.0 |
| Purchased secondary from new scrap | 49,134 | 59.9 | 24,576 | 30.0 | 8,270 | 10.1 | 81,980 | 100.0 |
| Total | 762,908 | 52.7 | 407,467 | 28.2 | 276,509 | 19.1 | 1,446,884 | 100.0 |

Further Extended

Table VI

(Continued)

Income of Metal (Integrated Producers)

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1950** | | | | | | | | |
| Production ................... | 707,954 | 49.2 | 433,504 | 30.2 | 296,570 | 20.6 | 1,438,028 | 100.0 |
| Purchased Primary ......... | 250,098 | 86.2 | 25,170 | 8.7 | 14,953 | 5.1 | 290,221 | 100.0 |
| Purchased secondary from old scrap and imported secondary ...... | 13,808 | 53.2 | 6,318 | 24.4 | 5,811 | 22.4 | 25,937 | 100.0 |
| Purchased secondary from new scrap | 25,794 | 50.3 | 13,868 | 27.0 | 11,633 | 22.7 | 51,295 | 100.0 |
| Total ............... | 997,294 | 55.3 | 478,860 | 26.5 | 328,967 | 18.2 | 1,805,481 | 100.0 |
| **1951** | | | | | | | | |
| Production ............... | 851,080 | 50.8 | 487,013 | 29.1 | 336,570 | 20.1 | 1,674,663 | 100.0 |
| Purchased Primary ......... | 71,981 | 66.7 | 16,906 | 15.6 | 19,084 | 17.7 | 107,971 | 100.0 |
| Purchased secondary from old scrap and imported secondary ...... | 7,851 | 49.7 | 3,481 | 22.0 | 4,469 | 28.3 | 15,801 | 100.0 |
| Purchased secondary from new scrap | 14,933 | 40.0 | 9,804 | 26.3 | 12,589 | 33.7 | 37,326 | 100.0 |
| Total ............... | 945,845 | 51.5 | 517,204 | 28.2 | 372,712 | 20.3 | 1,835,761 | 100.0 |
| **1952** | | | | | | | | |
| Production ............... | 935,136 | 49.9 | 553,218 | 29.5 | 386,310 | 20.6 | 1,874,664 | 100.0 |
| Purchased Primary ......... | 58,501 | 40.2 | 48,319 | 33.2 | 38,836 | 26.6 | 145,656 | 100.0 |
| Purchased secondary from old scrap and imported secondary ...... | 12,162 | 53.6 | 4,743 | 20.9 | 5,773 | 25.5 | 22,678 | 100.0 |
| Purchased secondary from new scrap | 38,435 | 52.8 | 15,527 | 21.3 | 18,898 | 25.9 | 72,860 | 100.0 |
| Total ............... | 1,044,234 | 49.4 | 621,807 | 29.4 | 449,817 | 21.2 | 2,115,858 | 100.0 |

Further Extended

Table VI

(Continued)

Income of Metal (Integrated Producers)

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousand of Pounds | % | Thousands of Pounds | % |
| **1953** | | | | | | | | |
| Production .............. | 1,222,614 | 48.8 | 665,051 | 26.6 | 616,240 | 24.6 | 2,503,905 | 100.0 |
| Purchased Primary ........ | 143,400 | 52.6 | 63,865 | 23.4 | 65,217 | 24.0 | 272,482 | 100.0 |
| Purchased secondary from old scrap and imported secondary ........ | 17,946 | 53.7 | 8,364 | 25.0 | 7,136 | 21.3 | 33,446 | 100.0 |
| Purchased secondary from new scrap | 53,417 | 48.6 | 30,720 | 27.9 | 25,824 | 23.5 | 109,961 | 100.0 |
| Total ................ | 1,437,377 | 49.2 | 768,000 | 26.3 | 714,417 | 24.5 | 2,919,794 | 100.0 |
| **1954** | | | | | | | | |
| Production .............. | 1,331,874 | 45.6 | 802,460 | 27.5 | 786,730 | 26.9 | 2,921,064 | 100.0 |
| Purchased Primary ........ | 126,802 | 73.1 | 9,523 | 5.5 | 37,208 | 21.4 | 173,533 | 100.0 |
| Purchased secondary from old scrap and imported secondary ........ | 11,494 | 56.2 | 4,651 | 22.7 | 4,305 | 21.1 | 20,450 | 100.0 |
| Purchased secondary from new scrap | 32,072 | 48.0 | 18,087 | 27.0 | 16,695 | 25.0 | 66,804 | 100.0 |
| Total ................ | 1,502,242 | 47.2 | 834,671 | 26.2 | 844,938 | 26.6 | 3,181,851 | 100.0 |
| **1955** | | | | | | | | |
| Production .............. | 1,404,461 | 45.3 | 857,737 | 27.6 | 839,591 | 27.1 | 3,101,789 | 100.0 |
| Purchased Primary ........ | 134,031 | 73.7 | 16,273 | 8.9 | 31,687 | 17.4 | 181,991 | 100.0 |
| Purchased secondary from old scrap and imported secondary ........ | 5,794 | 33.2 | 10,235 | 58.5 | 1,454 | 8.3 | 17,483 | 100.0 |
| Purchased secondary from new scrap | 14,645 | 27.5 | 33,883 | 63.5 | 4,814 | 9.0 | 53,342 | 100.0 |
| Total ................ | 1,558,931 | 46.5 | 918,128 | 27.4 | 877,546 | 26.1 | 3,354,605 | 100.0 |

Further Extended
Table VI
(Continued)
Income of Metal (Integrated Producers)

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| **1949 (First Nine Months)** | | | | | | | | |
| Production | 492,196 | 51.2 | 272,897 | 28.4 | 196,681 | 20.4 | 961,774 | 100.0 |
| Purchased Primary | 76,223 | 89.0 | 4,924 | 5.8 | 4,490 | 5.2 | 85,637 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 23,103 | 61.2 | 11,565 | 30.6 | 3,096 | 8.2 | 37,764 | 100.0 |
| Purchased secondary from new scrap | 36,484 | 59.2 | 19,862 | 32.2 | 5,317 | 8.6 | 61,663 | 100.0 |
| Total | 628,006 | 54.7 | 309,248 | 27.0 | 209,584 | 18.3 | 1,146,838 | 100.0 |
| **1955 (First Nine Months)** | | | | | | | | |
| Production | 1,045,732 | 45.3 | 633,670 | 27.4 | 629,230 | 27.3 | 2,308,632 | 100.0 |
| Purchased Primary | 117,430 | 80.8 | 9,638 | 6.6 | 18,264 | 12.6 | 145,332 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 3,455 | 28.7 | 7,361 | 61.1 | 1,227 | 10.2 | 12,043 | 100.0 |
| Purchased secondary from new scrap | 11,373 | 28.7 | 24,231 | 61.1 | 4,041 | 10.2 | 39,645 | 100.0 |
| Total | 1,177,990 | 47.0 | 674,900 | 26.9 | 652,762 | 26.1 | 2,505,652 | 100.0 |
| **1956 (First Nine Months)** | | | | | | | | |
| Production | 1,110,953 | 46.6 | 620,555 | 26.1 | 649,853 | 27.3 | 2,381,361 | 100.0 |
| Purchased Primary | 130,467 | 66.7 | 16,418 | 8.4 | 48,654 | 24.9 | 195,539 | 100.0 |
| Purchased secondary from old scrap and imported secondary | 4,729 | 44.5 | 3,997 | 37.6 | 1,901 | 17.9 | 10,627 | 100.0 |
| Purchased secondary from new scrap | 15,279 | 42.8 | 14,087 | 39.5 | 6,345 | 17.7 | 35,711 | 100.0 |
| Total | 1,261,428 | 48.1 | 655,057 | 25.0 | 706,753 | 26.9 | 2,623,238 | 100.0 |

This Table adds to each producer's production and acquisitions as per Table IV, the recoverable portion of its purchases of new scrap, and its purchases of secondary derived from new scrap.

Further Extended
Table VII
Mill Costs (Cents per Pound of Pig)

| Year | Company | Raw Material Cost | Power Cost | Manufacturing Costs | Total Mill Costs |
|------|---------|-------------------|------------|---------------------|------------------|
| 1947 ...........| Alcoa | 3.71 | 1.73 | 3.96 | 9.40 |
| | Reynolds | 3.03 | 2.17 | 4.29 | 9.49 |
| | Kaiser | 4.93 | 1.90 | 3.55 | 10.38 |
| 1948 ...........| Alcoa | 3.87 | 1.79 | 4.55 | 10.21 |
| | Reynolds | 3.34 | 2.60 | 4.72 | 10.66 |
| | Kaiser | 4.97 | 1.93 | 4.27 | 11.17 |
| 1949 ...........| Alcoa | 4.14 | 1.94 | 4.86 | 10.94 |
| | Reynolds | 3.56 | 2.28 | 5.60 | 11.44 |
| | Kaiser | 5.14 | 1.81 | 4.58 | 11.53 |
| 1950 ...........| Alcoa | 4.21 | 2.05 | 5.12 | 11.38 |
| | Reynolds | 3.18 | 2.27 | 4.48 | 9.93 |
| | Kaiser | 5.21 | 1.80 | 4.35 | 11.36 |
| 1951 ...........| Alcoa | 4.02 | 2.70 | 5.57 | 12.29 |
| | Reynolds | 3.70 | 2.60 | 4.84 | 11.14 |
| | Kaiser | 5.36 | 1.85 | 5.09 | 12.30 |
| 1952 ...........| Alcoa | 4.65 | 2.73 | 6.34 | 13.72 |
| | Reynolds | 4.31 | 2.70 | 5.31 | 12.32 |
| | Kaiser | 5.86 | 2.11 | 7.22 | 15.19 |
| 1953 ...........| Alcoa | 4.71 | 2.93 | 6.43 | 14.07 |
| | Reynolds | 4.63 | 3.16 | 5.42 | 13.21 |
| | Kaiser | 6.15 | 2.21 | 8.47 | 16.83 |
| 1954 ...........| Alcoa | 4.42 | 2.82 | 6.40 | 13.64 |
| | Reynolds | 4.85 | 3.10 | 4.89 | 12.84 |
| | Kaiser | 5.36 | 1.91 | 7.45 | 14.72 |
| 1955 ...........| Alcoa | 4.44 | 2.93 | 6.06 | 13.43 |
| | Reynolds | 4.50 | 3.07 | 5.71 | 13.28 |
| | Kaiser | 4.85 | 1.88 | 7.13 | 13.86 |
| 1949 (9 mo.) .........| Alcoa | 4.00 | 1.78 | 4.73 | 10.51 |
| | Reynolds | 3.71 | 2.32 | 5.01 | 11.04 |
| | Kaiser | 5.18 | 1.81 | 4.64 | 11.63 |
| 1955 (9 mo.) .........| Alcoa | 4.45 | 2.76 | 6.04 | 13.25 |
| | Reynolds | 4.78 | 3.12 | 5.28 | 13.18 |
| | Kaiser | *4.84 | 1.88 | *7.11 | *13.83 |
| 1956 (9 mo.) .........| Alcoa | 4.60 | 3.06 | 6.16 | 13.82 |
| | Reynolds | 4.56 | 3.05 | 6.02 | 13.63 |
| | Kaiser | 5.08 | 1.85 | 7.35 | 14.28 |

*Corrected figure.

Further Extended

Table VIII

Net Worth

| | Alcoa | | Reynolds | | Kaiser | | Total For Three Companies | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| December 31, 1947 | *269,409 | 82.5 | 43,202 | 13.2 | 13,980 | 4.3 | 326,591 | 100 |
| December 31, 1948 | *297,770 | 78.3 | 50,444 | 13.3 | 32,022 | 8.4 | 380,236 | 100 |
| December 31, 1949 | 306,407 | 76.7 | 55,103 | 13.8 | 37,725 | 9.5 | 399,235 | 100 |
| December 31, 1950 | 341,008 | 75.1 | 66,013 | 14.6 | 46,905 | 10.3 | 453,926 | 100 |
| December 31, 1951 | **360,649 | 72.0 | 80,224 | 16.0 | 60,166 | 12.0 | 501,039 | 100 |
| December 31, 1952 | **391,319 | 69.2 | 93,381 | 16.5 | 81,013 | 14.3 | 565,713 | 100 |
| December 31, 1953 | **435,304 | 66.9 | 109,061 | 16.8 | 106,076 | 16.3 | 650,441 | 100 |
| December 31, 1954 | **486,273 | 66.4 | 126,873 | 17.3 | 119,137 | 16.3 | 732,283 | 100 |
| December 31, 1955 | 555,135 | 62.3 | 156,174 | 17.5 | 179,552 | 20.2 | 890,861 | 100 |
| September 30, 1949 | 314,118 | 78.1 | 52,717 | 13.1 | 35,323 | 8.8 | 402,158 | 100 |
| September 30, 1955 | **541,841 | 65.2 | 150,531 | 18.1 | 138,986 | 16.7 | 831,358 | 100 |
| September 30, 1956 | 605,079 | 57.2 | 220,370 | 20.9 | 231,522 | 21.9 | 1,056,971 | 100 |

187

NOTES:

*Prior year adjustments made in 1950, as per corrections shown in Alcoa's annual report for that year, included a restatement of earnings for the years 1947, 1948 and 1949, which adjusted the amount of retained earnings previously reported for these years. The net worth figures of Alcoa shown above reflect these adjustments. The figures shown in Table VIII in the Court's opinion as of December 31, 1947 and December 31, 1948, were:

December 31, 1947 ............ 271,739  82.6  43,202  13.1  13,980  4.3
December 31, 1948 ............ 300,567  78.5  50,444  13.2  32,022  8.3

**Prior to 1955, Alcoa followed the accounting practice of recording on its books, as a cost, the entire amount of accelerated amortization allowed for Federal income tax purposes with respect to facilities constructed under Certificates of Necessity. In 1955, Alcoa changed its accounting practice so as to record on its books, as a cost, depreciation at normal rates with respect to facilities constructed under Certificates of Necessity and to provide an appropriate reserve for future Federal income taxes, thereby recognizing the taxes which will be payable when recorded depreciation will exceed the amount deductible for tax purposes. At the same time, Alcoa restated its earnings retroactively to 1951 to reflect this change in accounting practice. The figures given above reflect the application of the changed accounting practice, and thus differ from the Alcoa figures and the percentages shown in Extended Table VIII for the periods designated.

Further Extended

Table IX

Earnings

| | 1947 | | 1948 | | 1949 | | 1950 | | 1951 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| Earnings before Taxes | | | | | | | | | | |
| Alcoa .............. | *49,566 | 74.9 | *67,817 | 66.7 | 37,392 | 61.0 | 90,857 | 63.3 | **116,919 | 58.4 |
| Reynolds .......... | 6,136 | 9.3 | 14,218 | 13.9 | 8,819 | 14.4 | 25,966 | 18.1 | 48,127 | 24.0 |
| Kaiser ............ | 10,452 | 15.8 | 19,709 | 19.4 | 15,081 | 24.6 | 26,669 | 18.6 | 35,282 | 17.6 |
| Earnings after Taxes | | | | | | | | | | |
| Alcoa .............. | *29,386 | 75.4 | *40,617 | 65.7 | 20,893 | 58.0 | 46,857 | 64.2 | ** 39,852 | 54.5 |
| Reynolds .......... | 3,297 | 8.5 | 9,037 | 14.6 | 5,503 | 15.3 | 12,600 | 17.3 | 15,838 | 21.6 |
| Kaiser ............ | 6,294 | 16.1 | 12,200 | 19.7 | 9,603 | 26.7 | 13,548 | 18.5 | 17,520 | 23.9 |
| Earnings after Taxes and Cash Dividends | | | | | | | | | | |
| Alcoa .............. | *17,132 | 71.2 | *28,361 | 62.1 | 8,637 | 47.4 | 34,601 | 63.4 | ** 23,928 | 46.7 |
| Reynolds .......... | 1,999 | 8.3 | 7,243 | 15.9 | 3,866 | 21.2 | 10,832 | 19.8 | 14,081 | 27.4 |
| Kaiser ............ | 4,944 | 20.5 | 10,069 | 22.0 | 5,703 | 31.4 | 9,180 | 16.8 | 13,261 | 25.9 |

See footnotes at end of table.

Further Extended

Table IX (Continued)

Earnings

| | 1952 | | 1953 | | 1954 | | 1955 | |
|---|---|---|---|---|---|---|---|---|
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| **Earnings before Taxes** | | | | | | | | |
| Alcoa ............... | **100,143 | 66.7 | **128,380 | 66.3 | **119,388 | 60.5 | 176,851 | 55.6 |
| Reynolds ........... | 34,457 | 22.9 | 35,166 | 18.2 | 38,596 | 19.5 | 69,988 | 22.0 |
| Kaiser ............. | 15,653 | 10.4 | 30,137 | 15.5 | 39,454 | 20.0 | 71,270 | 22.4 |
| **Earnings after Taxes** | | | | | | | | |
| Alcoa ............... | ** 47,362 | 67.4 | ** 60,495 | 64.6 | ** 61,875 | 60.7 | 87,601 | 55.5 |
| Reynolds ........... | 14,731 | 20.9 | 18,321 | 19.6 | 20,281 | 19.9 | 34,307 | 21.7 |
| Kaiser ............. | 8,225 | 11.7 | 14,824 | 15.8 | 19,738 | 19.4 | 36,021 | 22.8 |
| **Earnings after Taxes and Cash Dividends** | | | | | | | | |
| Alcoa ............... | ** 30,206 | 65.5 | ** 42,300 | 63.1 | ** 43,342 | 58.7 | 63,750 | 53.6 |
| Reynolds ........... | 13,064 | 28.3 | 15,659 | 23.4 | 17,471 | 23.6 | 29,282 | 24.6 |
| Kaiser ............. | 2,831 | 6.2 | 9,085 | 13.5 | 13,060 | 17.7 | 25,893 | 21.8 |

See footnotes at end of table.

Further Extended
Table IX (Continued)
Earnings.

| | 1949—First 9 Mos. | | 1955—First 9 Mos. | | 1956—First 9 Mos. | |
|---|---|---|---|---|---|---|
| | Thousands of Dollars | % | Thousands of Dollars | % | Thousands of Dollars | % |
| **Earnings before Taxes** | | | | | | |
| Alcoa ................ | 38,826 | 70.8 | **136,959 | 57.0 | 138,457 | 52.1 |
| Reynolds ............ | 5,969 | 10.9 | 51,950 | 21.6 | 63,092 | 23.7 |
| Kaiser .............. | 10,009 | 18.3 | 51,552 | 21.4 | 64,486 | 24.2 |
| **Earnings after Taxes** | | | | | | |
| Alcoa ................ | 22,744 | 69.9 | ** 68,280 | 56.6 | 67,160 | 50.7 |
| Reynolds ............ | 3,371 | 10.4 | 25,904 | 21.5 | 31,456 | 23.8 |
| Kaiser .............. | 6,421 | 19.7 | 26,346 | 21.9 | 33,701 | 25.5 |
| **Earnings after Taxes and Cash Dividends** | | | | | | |
| Alcoa ................ | 13,552 | 71.0 | ** 51,170 | 54.4 | 46,829 | 48.9 |
| Reynolds ............ | 2,237 | 11.7 | 23,643 | 25.1 | 26,305 | 27.4 |
| Kaiser .............. | 3,301 | 17.3 | 19,232 | 20.5 | 22,701 | 23.7 |

NOTES:

*Prior year adjustments, made in 1950, as per corrections shown in Alcoa's annual report for that year, included a restatement of earnings for the years 1947, 1948 and 1949. The figures for Alcoa shown above reflect these adjustments. The figures shown in Table IX in the Court's Opinion, for 1947 and 1948, were:

| | 1947 | | 1948 | |
| --- | --- | --- | --- | --- |
| | Thousands of Dollars | % | Thousands of Dollars | % |
| Earnings before Taxes | | | | |
| Alcoa | 50,708 | 75.4 | 68,283 | 66.8 |
| Reynolds | 6,136 | 9.1 | 14,218 | 13.9 |
| Kaiser | 10,452 | 15.5 | 19,709 | 19.3 |
| Earnings after Taxes | | | | |
| Alcoa | 30,528 | 76.1 | 41,083 | 65.9 |
| Reynolds | 3,297 | 8.2 | 9,037 | 14.5 |
| Kaiser | 6,294 | 15.7 | 12,200 | 19.6 |
| Earnings after Taxes and Cash Dividends | | | | |
| Alcoa | 18,274 | 72.5 | 28,827 | 62.5 |
| Reynolds | 1,999 | 7.9 | 7,243 | 15.7 |
| Kaiser | 4,944 | 19.6 | 10,069 | 21.8 |

**Prior to 1955, Alcoa followed the accounting practice of recording on its books, as a cost, the entire amount of accelerated amortization allowed for Federal income tax purposes with respect to facilities constructed under Certificates of Necessity. In 1955, Alcoa changed its accounting practice so as to record on its books, as a cost, depreciation at normal rates with respect to facilities constructed under Certificates of Necessity and to provide an appropriate reserve for future Federal income taxes, thereby recognizing the taxes which will be payable when recorded depreciation will exceed the amount deductible for tax purposes. At the same time, Alcoa restated its earnings retroactively to 1951 to reflect this change in accounting practice. The figures given above reflect the application of the changed accounting practice, and thus differ from the Alcoa figures and the percentages shown in Extended Table IX for the periods designated.

Further Extended

Table X

Aluminum Import Corporation

(now known as Aluminium Limited Sales, Inc.)

Sales of Primary Aluminum in the United States

| | Alcoa | | Reynolds | | Kaiser | | All Others | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % | Thousands of Pounds | % |
| 1946 | 6,000 | 10.2 | 50,117 | 85.1 | 0 | 0 | 2,800 | 4.7 | 58,917 | 100.0 |
| 1947 | 23,540 | 96.2 | 55 | .2 | 25 | .1 | 856 | 3.5 | 24,476 | 100.0 |
| 1948 | 104,142 | 65.3 | 10,588 | 6.6 | 5,252 | 3.3 | 39,593 | 24.8 | 159,575 | 100.0 |
| 1949 | 110,066 | 76.2 | 9,473 | 6.6 | 5,390 | 3.7 | 19,441 | 13.5 | 144,370 | 100.0 |
| 1950 | 224,870 | 70.4 | 19,315 | 6.1 | 10,525 | 3.3 | 64,456 | 20.2 | 319,166 | 100.0 |
| 1951 | 65,136 | 32.2 | 15,320 | 7.6 | 8,883 | 4.4 | 112,675 | 55.8 | 202,014 | 100.0 |
| 1952 | 29,246 | 13.8 | 16,029 | 7.5 | 16,770 | 7.9 | 150,684 | 70.8 | 212,729 | 100.0 |
| 1953 | *117,038 | *24.0 | 37,099 | 7.6 | 43,955 | 9.0 | 288,732 | *59.4 | *486,824 | 100.0 |
| 1954 | *105,878 | *26.5 | 0 | 0 | 31,719 | * 8.0 | 261,419 | *65.5 | *399,016 | 100.0 |
| 1955 | 124,571 | 31.8 | 0 | 0 | 28,583 | 7.3 | 239,207 | 60.9 | 392,361 | 100.0 |
| 1949 (1st 9 Mos.) | 71,079 | 78.3 | 4,971 | 5.5 | 3,889 | 4.2 | 10,835 | 12.0 | 90,774 | 100.0 |
| 1955 (1st 9 Mos.) | *117,969 | *37.1 | 0 | 0 | *19,309 | * 6.1 | *181,007 | *56.8 | *318,285 | 100.0 |
| 1956 (1st 9 Mos.) | 125,988 | 36.2 | 300 | .1 | 51,058 | 14.6 | 171,119 | 49.1 | 348,465 | 100.0 |

*Corrected figure.